THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. ALICE ANDERSON, DEFENDANT-APPELLANT.

Argued May 22 and 23, 1961—Decided June 30, 1961.

474

476

Mr. *Frank G. Schlosser* argued the cause for appellant.

Mr. *Francis X. Crahay,* Acting Prosecutor of Sussex County, argued the cause for respondent.

The opinion of the court was delivered by

WEINTRAUB, C. J. Alice Anderson was convicted of murder in the first degree and pursuant to the jury's recommendation was sentenced to life imprisonment. She appeals directly to us pursuant to *R. R.* 1:2–1(c).

The many issues raised require a substantial resume of the testimony.

In October 1959 Mrs. Anderson applied to Crown Finance Company, Inc., for a loan of $500. She had been married since 1940 to Ernest Anderson, Jr. The finance company granted the loan upon condition that her husband join with her in the execution of the application, the note and chattel mortgage, and also that he execute an assignment of his wages. The documents were handed to her for his signature. She returned them, purportedly so executed, but, it is admitted, the signatures were not Anderson's. Mrs. Anderson says she signed the papers with his authority. The documents plainly show the handwriting is not her normal script and hence a purpose to mislead the company is inescapable. In short, one could readily find either that she forged his signatures or that, if she had his authority, she nonetheless obtained moneys by the false pretense that the signatures were his.

For some time prior to the loan, Mrs. Anderson had an affair with John J. Cornwell, an ex-convict. Shortly after the loan, she and Cornwell journeyed to Alabama and obtained "one-day" divorces from their respective mates. The jury, incidentally, could find the $500 obtained from the finance company was paid over to Mrs. Cornwell in connection with the divorce. After returning to New Jersey, Mrs. Anderson and Cornwell took up residence as man and wife at the summer home leased from the Conahays in the Borough of Hopatcong. They had not married, although Mrs. Anderson testified they planned to do so and would have but for the homicide.

The victim, Charles P. Attard, became manager of the finance company's local office after the loan was granted.

The loan was in default. Quite obviously Anderson had disavowed the documents. Mrs. Anderson did not inform the company of her new abode. In December 1959 she applied to another finance company in the same town for a loan. Through existing channels, the manager of the second company learned of the Crown Finance loan and telephoned Attard, who quickly appeared and confronted Mrs. Anderson as she entered her automobile. She revealed her new address, agreed to make payments, and on December 17 did make a payment at the Crown Finance office. She made no further payment, apparently telephoning an explanation that she had injured herself.

On February 8, 1960 Attard went to the Hopatcong area to check on another account, and while there decided to call upon Mrs. Anderson. He telephoned her twice for travel directions which she gave.

Mrs. Anderson offered the defense that she killed Attard when he attempted to rape her. She testified that when she was at the Crown Finance office on December 17, Attard made advances which she physically repelled, and that thereafter he telephoned several times to invite her out for drinks. Attard was married and the father of a child. The defense continued that when Attard reached the Conahay home, Mrs. Anderson offered a modest payment, which he rejected saying that she was an honest woman, and that thereupon he resumed the theme that her favor would constitute payment of the debt. She said he seized her, that she broke away, obtained the gun and fired the fatal shot.

The gun was a Derringer with a capacity for two bullets of .22 calibre. It belonged to Mrs. Conahay, who left it in the house when she leased it to Cornwell and defendant. There was much evidence that prior to the day of the shooting the bullets had been removed from the weapon, from which the jury could infer that Mrs. Anderson loaded it, although this she denied. Indeed she insisted she thought the gun was empty. The evidence further showed the gun was kept in the kitchen. A finding that the gun was loaded

by defendant and carried from the kitchen to the room in which the shooting occurred was obviously critical with respect to her claim that she killed Attard in the course of an attempted rape.

The State contended the killing was the aftermath of the loan transaction. Mrs. Anderson admitted that Attard had accused her of forgery. The precise relationship between her involvement in the loan and the shooting, if the defense of rape be discounted as it was by the jury, is puzzling in the sense that the death of Attard could not have closed the book, but in these matters one cannot expect impeccable judgment.

The bullet entered below the right shoulder and took a downward course, from which one could find Attard was seated when he was shot. Large quantities of blood entered his lungs. He died, perhaps in about five minutes, of asphyxiation, loss of blood and shock.

The shooting occurred, according to Mrs. Anderson, in a room which, since a portion of the house was closed off to conserve fuel, served both as a bedroom and living room. She said she wanted to seek help but some women were chatting on the party line, and she abandoned her effort. Instead she turned to a plan of concealment. She waited for darkness. She dragged the body a considerable distance and with the aid of boards managed to "shoehorn" Attard into his automobile. She ejected the body in a remote area and abandoned the car near a tavern. She tried unsuccessfully to remove blood stains at the house. Although she denied knowledge, the fact is that a palpable effort was made to prevent identification of the body. Everything was removed from the clothing of Attard, except a quarter and a small emblem on the lapel of his coat. The gun, when found by the police, contained one live bullet. The spent shell was never found. The testimony shows the shell had to be removed manually. Mrs. Anderson said Attard had a card upon which he entered some notes. The card could not be found. When, early the following morn-

ing, a police officer telephoned to inquire about Attard, Mrs. Anderson said he had left about 2:30 P. M. the day before. Cornwell testified that when he returned from work late that evening she made no mention of any incident and appeared to be her usual self.

Attard's body and car were found early on the 9th. When the police confronted her at the Conahay home that morning, Mrs. Anderson denied knowledge of the killing. Shown blood stains, she said she had cut her foot, and when an inspection showed no cut, she admitted the shooting. She signed a statement that day. In it she said Attard reached her home at about 4 P. M., told the story of his advances, and of his "proposition of December" that "I will mark it paid in full if you come across." It is significant that (1) she said Attard had removed his suit coat, a claim refuted by the fact that the garment was pierced by the bullet and was bloodied; (2) she told Attard she had no money whereas at the trial she said she did and had offered a payment—a circumstance pertinent upon whether she would have given him the detailed directions to her home if no payment could have been made and she had in fact been manhandled by Attard in December; (3) she said she obtained the gun in the kitchen after fleeing from the bedroom, whereas at the trial she claimed the gun was in a dresser drawer in the bedroom, within easy reach; and (4) she said she made no effort to call for help, whereas at the trial she sought to mitigate the failure to seek aid for the wounded man or for herself by claiming the party line was busy.

Mrs. Anderson retained counsel. On February 18 her attorney presented the State with another statement in which she said she had not shot Attard, and indeed had not seen him that day; that she left the house at about 1 P. M. and spent the day at Dover with one Olivia Broxton; that she returned home at 10:15 P. M.; that Cornwell was already home, having returned earlier than usual; that at 3 A. M., Cornwell told her he had had a tussle with that "bastard

from the Finance Company" and "the gun went off"; that Cornwell made her tell the story she gave on February 9; that since then "I have reflected upon this and taken spiritual advice and have been advised to make a clean breast of everything"; that "my family has visited me and I have been visited by my attorney and my spiritual advisor all of whom have urged me to tell the absolute truth which I have done in this statement."

Asked by a police officer to square the new statement with her prior claim that Attard had sought to force himself upon her in December, she said no such thing had occurred and that she invented the story to buttress the rape theme which Cornwell had suggested. Confronted by Cornwell, she stayed with her new statement. But Cornwell had an air-tight alibi—his presence at work was incontestable. At the trial Mrs. Anderson reverted to her first statement, with however significant contradictions, some of which we have already noted.

The defense sought to explain the false accusation against Cornwell by saying she had been "brainwashed" by everyone, including her attorney and the police, who could not believe that a woman who stood 5 feet 2 inches and weighed 112 pounds could have handled the body of Attard, a large man of about 200 pounds in weight. It is clear that the police doubted her story because of that circumstance and suspected she at least had help in disposing of the body. But the jury could readily find she was not at all "brainwashed" in the sense that she believed she was not the one who shot Attard. Indeed her own testimony never went to that length. The jury could find the effort to involve Cornwell was quite cunning, exploiting his criminal record and involving the expectation or hope that the woman she named would give false testimony to support the alibi. The reference to her spiritual advisor could also be deemed to be an astute effort to bolster a fabrication, to which circumstance we shall later refer again.

## I.

Defendant alleges a number of errors with respect to the admission and exclusion of evidence.

## A.

Defendant complains of testimony of her adultery, citing *State v. Marchand*, 31 *N. J.* 223 (1959). There the State gratuitously injected a suggestion of unchastity into an arson case. There was no connection whatever between the imputed conduct and the offense for which the defendant was on trial. In the circumstances of that case, that testimony, coupled with inadmissible proof of a prior fire, had the clear capacity to tilt the scales and hence we ordered a new trial.

Here, however, defendant's adultery was part of the fabric of the case. She and Cornwell lived as man and wife at the place of the homicide, and she sought to lay the crime at his feet. Defendant herself chose to accentuate the immorality of her affair with Cornwell by challenging her divorce from Anderson when the State offered him as a witness. Moreover, the question of motive revolved about the loan from the finance company. Defendant insisted Anderson had authorized her to pledge his credit. The State, on the other hand, contended she shot Attard because she feared criminal liability with respect to the loan, and hence the State sought to prove that prior to the loan defendant had parted with Anderson to take up with Cornwell, and had done so with Anderson's knowledge. Thus it was relevant that defendant and Cornwell had journeyed south together in the summer of 1959 and that Anderson had found them together at a motel prior to the loan transaction. As we said in *State v. West*, 29 *N. J.* 327, 335 (1959), where also a challenge was made to evidence admitted on the subject of motive:

"* * * That evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof. The unwholesome aspects, authored by defendant himself, if the evidence be believed, were inextricably entwined with the material facts."

■ The State did try to step out of bounds when it referred to a Mr. Sutton. In her direct testimony defendant mentioned Clarence Sutton. She was relating a conversation with Detective Skarzynski at the Conahay home on the morning after the shooting. She volunteered, "I remember Mr. Skarzynski saying to me, 'I know you.' And he made a reference to a man by the name of Mr. Sutton." The detective had already so testified on the State's case. On cross-examination she was reminded of her reference to Sutton, and asked if she knew him, to which she replied, "A very good friend, yes * * * I have known Clarence all my life." It was then brought out that she had lived in California for a while, which was followed with the question, "With Mr. Sutton?" Defense counsel objected and the trial court upheld the objection. The examination continued with respect to whether she was shocked by Skarzynski's mention of Sutton, to which she replied that it shocked the detective and not her, and added the detective "told me a story about Mr. Sutton." The prosecutor then asked:

"Q. You would rather forget about that particular name, wouldn't you?"

The trial court promptly sustained an objection saying, "That remark will be stricken and the jury is to disregard it." At that juncture the defendant interjected "Would you want me to tell you what Skarzynski said to me?" following which she yielded to her attorney's advice to answer questions and to volunteer nothing.

■ The evidence suggests no basis for the prosecutor's question. If the purpose was to prove an affair between defendant and Sutton, it was plainly improper. But the trial court sustained the objection and instructed the jury

to disregard the reference. Upon the whole record, we cannot find residual harm.

In this connection complaint is made of the prosecutor's remarks in summation concerning defendant's worldliness. They were in part responses to the references in the defense summation to defendant, age 37, as a "girl" and to her "childlike" behavior in choosing to conceal the event rather than to summon help as one would expect of a woman circumstanced as she claimed she was. We do not think the argument went beyond fair comment. It did not suggest she should be discredited because of her unadjudicated adultery. Rather it was addressed directly and immediately to the credibility of her account of the fatal event.

### B.

As noted above, defendant referred to a meeting with her spiritual advisor in the statement of February 18 which sought to pin the homicide on Cornwell. She was cross-examined in that regard. She said she saw her priest on that day, following which she was asked, "And did you receive the sacraments on that day?" It developed she had made her spiritual confession before signing the statement and also received Holy Communion on the following day. She volunteered that in her confession she told the priest she had shot Attard. No question was designed to elicit that confidential communication; quite obviously defendant offered the disclosure in the belief that it would palliate what was plainly a difficult predicament, although it actually refuted any suggestion that she had been "brainwashed" into making the false accusation against Cornwell.

Counsel argues it was devastating to bring out that a Roman Catholic accepted Holy Communion after falsely charging another with murder. Nonetheless the inquiry was proper in the circumstances of this case.

Defendant offered the defense that she killed to protect herself from rape. The fabrication of February 18, intended to mislead the police in its investigation, was a species of

conduct from which the jury could infer a sense of guilt, incompatible with her version of the homicide. 1 *Wharton, Criminal Evidence* § 143, *pp.* 267–68 (12th ed. 1955); 2 *Wigmore, Evidence* §§ 276–78, *pp.* 111–26 (3d ed. 1940); see *State v. Petrolia,* 45 *N. J. Super.* 230, 233 (*App. Div.* 1957), certification denied, 25 *N. J.* 43 (1957), *cert.* denied, 355 *U. S.* 942, 2 *L. Ed.* 2d 422 (1958); *State v. De Falco,* 8 *N. J. Super.* 295, 300 (*App. Div.* 1950). Indeed, counsel did not object to the introduction of the statement itself, doubtless because of the principle of law we have just stated. The same principle supports the ruling here challenged. Defendant herself injected the religious aspect when she twice referred in the statement of February 18 to meeting with her spiritual advisor. That she made a confession and then received Holy Communion could be found to have been part and parcel of the plan, to give credence to the false claim. Indeed, it is difficult to believe they were not. The evidence was properly received for the jury's evaluation.

## C.

The State called Ernest Anderson as a witness. Defendant immediately objected on the thesis that he was still her husband and could not testify without her consent, citing *Rules* 23 and 28 of The Evidence Act, 1960 (*L.* 1960, *c.* 52 §§ 17 and 22, *N. J. S.* 2A:84A–17, 22). The trial court permitted counsel to examine Anderson with reference to the Alabama divorce, and held it to be invalid. Thereupon Anderson was withdrawn. We pass the question whether defendant should have been permitted in this proceeding to dispute a divorce she obtained.

Defendant complains that both the court and the prosecutor "commented" upon her claim of privilege in violation of *Rule* 39 (§ 31) of The Evidence Act of 1960, *N. J. S.* 2A:84A–31. The "comment" is claimed to inhere in a disclosure to the jury that defendant refused to consent, from which it is argued the jury might have inferred that had

he testified he would have said his signatures on the documents delivered to the finance company were forgeries.

After sustaining the defense objection, the trial court explained the legal thesis to the jury in the course of which he mentioned, without adverse criticism, that defendant withheld her consent. There was no objection or request to instruct the jury. The reason is quite clear. The defense itself had already so informed the jury, for it made its objection and argument in the presence of the jury, in the course of which the statutory provision requiring consent was read.

The subject arose again on the defendant's case. On her direct testimony, defendant testified to conversations with Anderson with respect to the loan. The prosecutor, without objection, cross-examined with respect to that testimony. She answered that she laid the documents before Anderson, that he told her to take care of them, and that she signed his name in his presence. The prosecutor then asked her if she would consent to permit Anderson to testify. At that juncture objection was made and in the course of the examination she said she would not, upon the advice of counsel. Although the point was not made, it seems clear that defendant waived the privilege when she herself testified to the transaction with Anderson. *Rule* 37 (§ 29) of The Evidence Act, 1960, *N. J. S.* 2*A*:84*A*–29; see 8 *Wigmore, Evidence* § 2242, *p.* 256 (*McN. rev.* 1961). Apparently the subject of waiver did not occur to the prosecutor and he pressed his question lest the jury draw an inference against the State if it did not know that her refusal to consent barred the testimony. At any rate, the trial court sustained the defense objection and twice instructed the jury that no inference could be drawn against defendant, thus satisfying the provision of *Rule* 39 that a cautionary instruction in support of the privilege shall be given upon request of the party exercising it.

An objection to testimony by a spouse should be heard outside the presence of the jury, and doubtless it

would have been so heard if defendant had requested it. In proscribing "comment" by court or counsel, *Rule* 39 seeks to prevent an adverse inference against the party claiming the privilege. It does not, however, intend an adverse inference against the opposing party. Hence if that possibility is present, the jury should be told that under the law the spouse may not testify and that no inference can be drawn against either party. The events we have described prevented that simple approach. Under the circumstances, the cautionary instruction which the court gave was the only feasible course. We find no error. We add that no harm could have ensued even if the jury did speculate along the lines the defense suggests. It was perfectly apparent from defendant's own testimony and the face of the loan documents that she was badly enmeshed in a fraud upon the finance company, and it really mattered little in the present case whether her offense was forgery or false pretenses or both.

## D.

To escape the impact of her false statement of February 18 accusing Cornwell of murder, defendant, as we have already recounted, claimed she yielded to the pressure of her attorney, family, police, and others who would not believe a woman of her size could have disposed of the body of the victim. She testified fully with regard to the doubts expressed to her. It included testimony that matrons at the jail related to her what "they heard on the outside, and this constant doubt that they didn't think that I did it." She then referred to one matron who said "I don't know why you are covering up for that character Cornwell." At that point the prosecutor objected and the trial court instructed the jury to disregard "whatever testimony this witness has said of what any matron said to her in the jail." The trial court thought such testimony was "hearsay," but it then permitted defendant to testify to similar conversations with one of her attorneys who had died before trial.

 We think the trial court erred, for what transpired in defendant's presence was not "hearsay." She could thus seek to account for the false statement she delivered to the State, just as, for example, a defendant may challenge a confession by proving circumstances disputing its voluntariness. We, however, see no harm. Defendant testified quite abundantly to the doubts expressed by others including police officers, and that such doubts were communicated to her was in fact developed on the State's case and not disputed. Moreover, as we have said, defendant's own testimony never went the length of claiming she was "brainwashed" into believing her false statement was true. The jury could readily find she seized an opportunity to capitalize upon those doubts and the apparent vulnerability of Cornwell.

E.

 About January 30, 1959, Cornwell was involved in an automobile accident. He apparently drank heavily, much to the disapproval of defendant. He testified that a day or two later, as he came out of the bathroom, he saw defendant standing in the kitchen with the gun in her hand. He was asked if she said anything. Objection was made, but was overruled upon the prosecutor's representation that "it certainly will be tied up through subsequent testimony." Cornwell then answered that "She said if I didn't straighten out, she'd shoot me." The court informed the jury that "this is being admitted subject to the fact that it will be tied in. If it is not, this will all be stricken from the record." Cornwell then said "I took the gun away from her and unloaded it and put it up on the shelf," and that the gun was not thereafter handled by anyone in his presence.

Subsequently the court concluded the tie-in was not made and informed the jury he was striking the testimony with respect to the threat to shoot. Defendant now complains the court failed to add that the testimony be "disregarded." That criticism is minuscule. The jury could have had no

other understanding. Counsel did not seek an addendum to the instruction.

The testimony was probably competent. It was pertinent to show the gun had been unloaded, since the State's thesis was that defendant loaded the weapon at the time of the homicide, a fact which could clash with her version of the attempted rape. If Cornwell had testified he unloaded the weapon but failed to explain why, his testimony would have been incomplete and less credible. The situation was one in which a court in its discretion could have excluded the testimony as to the threat upon the thesis that its prejudicial character grossly outweighed its contribution to the case. On the other hand, the threat was not reasonably indicative of a propensity to shoot; the picture was that of a woman who sought to shock her fiance out of a drinking habit. The testimony presented a close question. The court immediately cautioned the jury to accept it with a mental reservation and then struck it from the case. We cannot conclude there was prejudicial error.

## F.

The trial court admitted photographs of the body of Attard made both at the scene where it was found and at the morgue. Defendant objects only to the pictures taken at the morgue, and cites *State v. Walker*, 33 *N. J.* 580, 596 (1960), where we held photographs of the brain of the decedent should not have been admitted. We there repeated that photographs of the victim may be received if they are probative, but held that pictures of the brain itself, which added nothing but gruesomeness to the case, should have been rejected.

Here the photographs were fully probative. They showed the point of entry of the bullet and extensive scraping and gouging of the body of the victim. Pictures of a corpse are never pleasant, but it was necessary for the State to show the extensive injuries to the body to support its contention that defendant did perform the prodigious feat of disposing

of the remains as she in her confession said she had. It is no answer to say the defense did not dispute what the State sought to prove. In a capital case the State must prove the charge.

## G.

█ Upon his direct examination of Cornwell, the prosecutor elicited his convictions for crime. *State v. Holley,* 34 *N. J.* 9 (1961). He said he had been convicted of atrocious assault and battery and robbery, two incidents being involved. His testimony was not too clear but as we read it he said he was convicted of both offenses with respect to a victim named Kennedy and that he was also convicted of robbery of a woman named Goble. On cross-examination the defense developed that in the Kennedy matter he was convicted of robbery, and that in the Goble matter the offense was larceny rather than robbery as Cornwell had said on his direct. The questioning elicited the sentences imposed. It also included an admission in terms of the content of the Goble indictment. A controversy developed over a question as to whether he was "charged" with "an atrocious assault and battery by maiming and wounding Joseph Kennedy." A reference to the indictment fails to reveal the quoted words but at any rate an objection was sustained. Later defendant offered the judgment record and the indictments, which the court declined to receive.

Cornwell freely admitted the convictions. Despite the controversy at the trial, we fail to see anything of significance which was excluded. If it be assumed that the contents of the indictments are part of the record of conviction within the meaning of *N. J. S.* 2A:81–12, see *State v. Costa,* 11 *N. J.* 239, 250 (1953), yet the fact is that the contents of the Goble indictment were revealed and admitted by Cornwell and that the contents of the Kennedy indictment were substantially shown. What was not revealed could hardly have enhanced the attack upon Cornwell for the Kennedy

indictment charged the taking of but $10, and that Cornwell and a codefendant "did beat, wound and ill-treat" the victim. Actually Cornwell had admitted the greater offense of *atrocious* assault and battery (*R. S.* 2:110–1[1]), whereas in fact he was charged and convicted only of simple assault and battery (*R. S.* 2:103–1[2]). The convictions having been freely admitted, there was nothing to be contradicted by the exhibits the defendant offered and hence they were properly excluded. See *State v. Costa, supra* (11 *N. J.,* at *pp.* 251–2). We find no error and no conceivable harm.

## H.

Cornwell testified that a day or two after her arrest defendant asked him to bring articles of clothing to her from the Conahay home. He did, and among them was her housecoat. When Cornwell brought it to the jail, the guard made the usual inspection and found a live .22 calibre shell in a pocket, whereupon he summoned a trooper. The court declined to admit the bullet into evidence but refused to strike the testimony of the guard and the trooper, saying "Of course the testimony isn't binding on the defendant" and "who put them [the contents of the pocket] there or how they got there is not binding upon the defendant." The quoted language is obscure but clearly the testimony that a live bullet was in the housecoat remained in the case. The State cross-examined defendant with respect to it and she disavowed knowledge.

The defense contended the State should have affirmatively excluded the possibility of tampering by Cornwell. The incident occurred before defendant's false accusation against Cornwell, and there is no intimation of animosity against her at the time he delivered the garment. He was not recalled for further direct or cross-examination.

---

[1] Now *N. J. S.* 2A:90–1.
[2] Now *N. J. S.* 2A:85–1.

We think the testimony was admissible. The garment was hers and in the house at the time of the shooting. *Cf. State v. Hill,* 65 *N. J. L.* 626 (*E. & A.* 1900). The house itself was under police guard, and Cornwell had to get the permission of the chief of police to obtain the garment. Surely the State is not limited to such evidence as it finds at once or in the presence of an accused. Nor need it, when it proves through a witness that something was found, lay a foundation by asking the witness whether he "planted" the object. If a police officer had run that errand for defendant or had found the shell in the garment at the house, one would hardly require an affirmative statement by the officer that he was not guilty of tampering. Here the messenger was Cornwell. As we have said, he had no apparent reason at that time to hurt defendant. The possibility that someone other than defendant placed the shell in her housecoat goes to the probative weight of the evidence rather than its admissibility. See *People v. Kristy,* 111 *Cal. App.* 2d 695, 245 *P.* 2d 547, 556 (*D. Ct. App.* 1952). The same observation applies to the time interval between the shooting and the discovery. 2 *Warren, Homicide* § 215, *p.* 632 (1938).

## II.

Defendant complains of so much of the prosecutor's summation as suggests or argues she forged the signature of Anderson to the loan instruments. She said she signed the papers. On their face Anderson's signatures appear in a style markedly different from hers and she signed as a witness to them. These circumstances, coupled with the evidence of their marital rift, justified the prosecutor's argument. Moreover, we repeat that in this case it made no real difference whether she forged his signatures or falsely represented that they were his.

Defendant contends the State's summation deprived her of a fair trial. Most of the matters now questioned were

not challenged at the trial. No useful purpose would be served by an extended discussion of them. We are satisfied the comments were based upon the evidence and permissible inferences from it. Her credibility was strongly assailed but the attack was grounded in the record. We find no suggestion that defendant be convicted because of some misdeed other than the slaying of Attard. Although some of the language is colorful—both sides drew liberally from Biblical and literary sources—we find nothing transcending the limits of fair argument.

Two matters at first troubled us, but upon reflection we conclude there is no basis for reversal.

The first is the prosecutor's statement, "And many of the things we developed, we can't bring in here as evidence. We are limited by the Rules of Evidence as to what we can tell you. Other things might have a prejudicial tendency." This statement appears in the middle of the prosecutor's discussion of the testimony of Mrs. Fitzgerald, an employee of Crown Finance. He said he told her precisely what the area of her examination would be so that she could gather the data and be prepared to answer. Apparently his purpose was to explain why he limited the examination to certain entries in the account, being mindful that the jurors would know the full record contained still more information. Although at first, upon seeing the quotation out of context, we thought the statement might be calculated and understood to mean the State had other undisclosed evidence proving guilt, our further inspection satisfies us it had no such import. Rather the prosecutor was saying that the law bars certain things as a matter of fairness. Elsewhere he represented that he had produced all of the evidence he had, saying "The State must bring in all of the evidence it has, present it to you, and you make up your mind on the particular matter." We are satisfied the State did not ask the jury to consider anything but the evidence before it. *Cf. State v. Hipplewith*, 33 *N. J.* 300, 311–12 (1960). Defense counsel, of wide experience in

criminal law, did not protest at the trial, a fact which supports our view that in context the remark did not carry the implication it might have when viewed in isolation. The trial judge directed the jury to consider the evidence in the case. We cannot find plain error.

 The other matter is the prosecutor's statement that "As a matter of fact, the first homicide that came to my attention when I was prosecutor in this county involved a man who was shot coming into somebody else's home. It never got beyond the Grand Jury." The statement was made in explicit reply to the extreme argument of defense counsel that if defendant should be convicted no woman or home would be safe from invasion. In context, it did not carry the implication that the prosecutor moves a charge only if he personally is convinced of guilt, or that a grand jury indictment imports guilt. It served merely to refute an argument which actually needed no refutation. That it was so understood when made seems evident from the fact that it did not elicit an objection, although, as the record shows, defense counsel did not hesitate to question the summation when he felt the prosecutor departed from the proper course.

### III.

Next we consider a group of alleged errors relating to the court's charge to the jury.

### A.

 Before discussing the elements of the offense, the trial court read the statutes defining murder (*N. J. S.* 2*A*:113–1) and murder in the first degree (*N. J. S.* 2*A*:113–2). The latter includes:

"Murder which is perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which is committed in perpetrating or attempting to perpetrate arson, burglary, kidnapping, rape, robbery or sodomy, is murder in the first degree. Any other kind of murder is murder in the second degree. * * *"

The case was tried solely on the theory of a "willful, deliberate and premeditated killing." We see no need to read the entire statute to a jury, although we note from time to time that some trial judges do. Defendant objected to "the inclusion of felony murder in this case." The trial court took no action, doubtless because it did not see how the jury could have thought a felony killing was involved merely because the entire statute was read.

Defendant points to the fact that only a quarter was found in Attard's pocket, and to her statement of February 9 in which she said she told Attard she had no money, whereas she had $35 when she was arrested. The fact, however, is that no one at any time intimated that defendant killed Attard in the course of a robbery. Rather, as we have said, the theory was a "willful, deliberate and premeditated killing," and the trial court's charge confined the jury to that thesis. We do not believe the jury could have thought otherwise.

### B.

Defendant contends the jury was told that the offense could not be murder in the second degree if there was an intent to kill. She relies upon the following excerpts from the charge:

"The distinguishing feature between the two degrees of murder is the *intent* with which the homicidal act was done." (Emphasis added)

and

"Murder in the second degree comprehends those cases of murder which are an attempt to do grievous bodily harm without the intent to take life, or where the act is done in the heat of passion but without justification, and lacking one or more of the essential elements of the highest degree of the crime, which are premeditation, deliberation and willfulness."

Defendant apparently reads the word "intent" in the first quoted portion to mean "intent to kill." It is not thus limited.

It would be more accurate to substitute "mental operations" in that introductory statement to the definition of the degrees of murder. But the question before us is whether in the context of the entire discussion, the jury was correctly informed of the necessary findings. It is impossible to state the entire subject in a single sentence. Ultimately the thoughts to be conveyed are: (1) that intent to do grievous bodily harm is *sufficient* for murder in the second degree; (2) that to raise the offense to first degree the State must prove (a) premeditation, which is the conception of the design or intent to kill, (b) deliberation, which is a reconsideration of the design to kill, a weighing of the pros and cons with respect to it, and (c) willfulness, which means an intentional execution of the plan to kill which had been conceived and deliberated upon; and (3) that if the State fails to prove any one of those further elements, the offense remains murder in the second degree. *State v. DiPaolo,* 34 *N. J.* 279, 295 (1961). As we pointed out in *State v. Ernst,* 32 *N. J.* 567, 580 (1960), trial judges sometimes add an explicit statement that an intent to kill is consistent with murder in the second degree. But ultimately the issue is whether on the entire charge the jury was fairly instructed with respect to the essential elements of first degree and that, if any are lacking, the State failed in its burden to elevate the degree of the offense. We are satisfied that when the challenged excerpts are read in conjunction with the remainder of the charge, the jury understood that an intent to kill was not alone sufficient to elevate the offense to first degree. This situation is quite the same as the one presented in *State v. Tansimore,* 3 *N. J.* 516, 526 (1950).

## C.

The trial court charged the burden was upon defendant to prove by a preponderance of the evidence that she killed to protect herself from an *attempted* rape. No objection was made to the charge.

██ Defendant intertwines two criticisms. The first is that the court did not expressly state the evidence to be considered should include the proof adduced on the State's case. The answer is that there is no reason why anyone would think the court intended to limit the evidence to that presented by defendant and further that everything of real significance in fact appeared in the defense.

██ The second complaint is that the court failed to charge request No. 21 which reads:

"The defendant is entitled to the benefit of a reasonable doubt upon the whole case as it goes to the jury, including the issue of self-defense."

The trial court thought it charged the substance of this and other requests on reasonable doubt. We think it did. Immediately after discussing the defendant's burden on the issue of self-defense, the court added that "It must be remembered, however, that although the burden is upon the defendant to establish such a defense, the burden of proving the defendant guilty of murder, or any degree thereof, beyond a reasonable doubt is always on the State, and that burden never shifts."

## D.

 Defendant requested a charge on the subject of circumstantial evidence. The charge as given was correct. That it did not follow the precise wording of the request is of course of no moment. The criticism advanced is that the court did not define circumstantial evidence. We do not understand what definition defendant claims should have been given or how the failure could have harmed her. Moreover we find no definition in the request. What the trial court omitted from the request was a statement that "circumstantial evidence is of two kinds, namely 'certain' or that from which the conclusion in question necessarily follows; and 'uncertain,' or that from which the conclu-

sion does not necessarily follow, but is probable only, and is obtained by a process of reasoning." The quoted language hardly defines the concept. The essence of the request was that "in a criminal case the evidence must exclude any other rational supposition but that of guilt and if it does not do so she must be acquitted." This thought the court charged clearly and even more extensively than requested.

## IV.

Finally defendant urges the court should have ordered an acquittal and the verdict was against the weight of the evidence. We see no merit in either claim.

As to an acquittal, defendant argues that there appeared a plausible story of self-defense in her statement of February 9 which the State put into evidence, and hence an acquittal was required. It is enough to say the State did not rest upon her statement. On the contrary, as the evidence recounted at the outset of this opinion shows, the State offered much proof which seriously punctured defendant's assertion that she killed to save herself from an attempted rape. *State v. Parker*, 33 *N. J.* 79, 93 (1960). No circumstance supported her claim in any substantial way, and many conflicted with it. Her credibility was the critical factor. As the narration to which we have referred amply shows, it would be difficult for anyone to believe her. Her fabrications before trial were monumental, and her testimony at the trial was extremely vulnerable. One cannot escape the conviction that she never told the whole story. The issue of guilt was plainly for the jury.

Defendant also contends that the evidence was not sufficient to show premeditation and deliberation, and hence the verdict should not have exceeded murder in the second degree. In this connection we must discount the story of an attempted rape as the jury had a right to do. There remained the conceded fact that Attard had accused her of forgery and her testimony and the exhibits which evidence a basis for fear of a criminal charge with respect to the

loan; present inability to discharge the debt; a visit by Attard with the aid of directions by her at a time when, the jury could find, she was unable to make any payment; the presence in the kitchen of an unloaded gun which, the jury could find, she there loaded either before or after Attard arrived, and carried into the room where the shooting occurred; the firing of a gun which had to be cocked and required a pressure on the trigger of seven and a half pounds; the failure to call for help, notwithstanding, as the jury could find, she did not know he was beyond medical aid. We think the evidence was sufficient for a finding of murder in the first degree. *Cf. State v. Peterson*, 10 *N. J.* 155, 163 (1952).

The judgment is accordingly affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*For reversal*—None.