**GOVERNMENT OF the VIRGIN ISLANDS, Appellee,**

v.

**Juan A. MARTINEZ, Appellant.**

**Nos. 84–3358, 84–3507.**

United States Court of Appeals, Third Circuit.

Argued April 23, 1985.

Decided Dec. 27, 1985.

As Amended Feb. 3, 1986.

Rehearing and Rehearing En Banc Denied Feb. 24, 1986.

As Amended March 4, 1986.

Michael A. Joseph (argued), Federal Public Defender, Christiansted, St. Croix, V.I., for Appellant.

Frederick D. Jones (argued), Office of the United States Attorney, Christiansted, St. Croix, V.I., for appellee.

Before ADAMS, GARTH, and BECKER, Circuit Judges

## OPINION OF THE COURT

ADAMS, Circuit Judge.

Juan Martinez appeals from his conviction and sentence of life imprisonment without parole for first degree murder, V.I. Code, tit. 14, § 922(a)(1). On appeal Martinez does not deny that he killed Felipe Gomez, but argues that the killing was not willful, premeditated, and deliberate as required for a first-degree conviction. Specifically, he appeals on two grounds. First, he contends that the evidence produced at trial was insufficient to support guilt beyond a reasonable doubt of first-degree murder. Second, Martinez maintains that he was denied a fair trial because the prosecutor failed to disclose exculpatory evidence to his counsel, despite a specific request by the defense. We conclude that the evidence supports Martinez's conviction. However, we believe that Martinez has made out an arguable violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) which requires that prosecutors disclose exculpatory evidence to the defense. As a result, we will remand for a hearing in order for the district court to determine whether Martinez should be afforded a new trial.

## I.

Juan Martinez killed Felipe Gomez on the night of March 4, 1984, in front of Building # 4 of the Walter I.M. Hodge Pavilion in Frederiksted, St. Croix. Miguel Lopez, who knew both Martinez and Gomez, and in whose house Martinez was staying that night, testified that he encountered Gomez while walking outside the housing project at about 10:00 p.m. Appellant's App. at 27A–29A. Gomez, who was intoxicated and armed with a knife, told Lopez that he was looking for Martinez. *Id.* at 27A. Lopez replied that Gomez was drunk, and should go home, but Gomez insisted that "he didn't care, that he wanted to go there and take [Martinez] out of the house." *Id.*

Gomez and Martinez appear to have been involved in a feud. *Id.* at 43A; 106A. Just three nights earlier, Gomez had been seen at the same apartment complex looking for Martinez. On that occasion, Gomez, who was drunk and armed with a shotgun, sought entry to Lopez's house in order to kill Martinez, who was known as Titoi. *Id.* at 43A. When Gomez was denied entry, he said to Martinez, "Titoi, if you don't get out, if you don't kill me I gonna kill you." *Id.* at 62A. This was not the first time Gomez had threatened to take Martinez's life. *Id.* at 106A. After a previous death threat which Gomez delivered in a face-to-face confrontation with Martinez, Martinez walked away. Later, though, he apparently vowed to take revenge; a friend testified Martinez told her, "if he don't kill Felipe [Gomez] his name is not Titoi [Martinez]."

*Id.* at 108A. Gomez was known to be a drinker and a fighter; asked whether Gomez knew how to fight, one witness testified that "that's all the man does." *Id.* at 129A.5.

On the night of March 4, after encountering Lopez outside of the project, Gomez proceeded to the front door of Lopez's house, where Martinez was staying, and pounded on it. *Id.* at 72A. Martinez answered from the side door, from which the front entrance can be viewed through a brick garden wall containing openings. *Id.* at 34A. An argument ensued, and shortly thereafter Martinez shot Gomez through the wall two or three times. *Id.* at 136A. Gomez fell to the ground. Martinez then came around to the front of the house, shot Gomez once or twice more while Gomez lay on the ground; Martinez then ran away. *Id.* at 38A–39A; 70A–85A.

When the police arrived shortly thereafter, they found no evidence of the knife Gomez had been seen brandishing outside the project before the shooting. Nor did they find any other weapon. The only person to have approached Gomez between the time he was shot and the time the police arrived was Gomez's brother, who was seen leaning over the body and opening Gomez's shirt. *Id.* at 54A; 66A.

All the above evidence was presented by government witnesses. At the close of the prosecution's case, Martinez's defense counsel moved for judgment of acquittal of first-degree murder, on the basis of insufficiency of the evidence to support first-degree homicide. She argued that "Mr. Gomez, himself, was known at the time to have been very drunk, to have been armed and to have previously threatened my client's life," and that the facts did not support the necessary premeditation and deliberation. The judge denied the motion. In his case, Martinez presented only an alibi defense, denying he had killed Gomez. He testified that he left Lopez's house at approximately 7 p.m., and spent the evening first at his sister's house and then at his father's house. Martinez's father,

brother, and two sisters testified in support of his story.

Only after his conviction, and during the separate sentencing proceding, did Martinez reveal that, before trial, he had confessed to the killing to a Spanish-speaking police officer, Detective Vigo. Martinez told the court that Gomez had arrived at Lopez's house with a shotgun as well as a knife, and that he had broken in the louver window to get to Martinez. Martinez said that he shot Gomez when Gomez pointed the gun at him. App. at 143–147. According to an affidavit taken later by an investigator for the Federal Public Defender, Detective Vigo stated that he relayed this confession to Detective Steve Brown, the principal case agent, who sat at the prosecutor's table throughout the trial, and to Assistant United States Attorney Frederick Jones, who prosecuted the case. App. at 14A.2. At oral argument in this appeal, the Assistant U.S. Attorney admitted that the confession had been passed on to Detective Brown, but denied that he himself was aware of it.

Martinez, who primarily spoke Spanish and used English only in a most rudimentary manner, never told his court-appointed counsel, a white female attorney who spoke only English, about this confession or about Gomez's gun. Until the sentencing hearing, he maintained to her that he had a valid alibi. There is some evidence he misunderstood her role as counsel, and believed that she was part of the adjudicatory apparatus that would rule on his guilt or innocence: in the pre-sentencing hearing, he related to the judge his fear "that she [his attorney] could find me in the first-degree murder." Appellant's App. at 145A.

Martinez's counsel had given the prosecutor a specific request, pursuant to Fed.R. Crim.P. 16 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), for "all oral confessions or statements, subsequently reduced to writing, summarized in police reports, made by the defendant." Martinez's confession put the prosecution in a position to know that there was little basis for Martinez's alibi defense,

but also that there was considerable question about the elements of premeditation and deliberation. The confession, therefore, although inculpatory, was also exculpatory.

Once she learned of the confession at the sentencing proceeding, Martinez's counsel informed the court that she would seek a new trial based on the prosecution's failure to disclose the confession. The judge denied Martinez's motion for a new trial, and imposed a sentence of life imprisonment without parole. Martinez filed a timely appeal.

## II.

■ Martinez first contends that the evidence submitted to the jury was insufficient to support premeditation and therefore does not support a conviction for first degree murder. The evidence, however, adequately supports the jury's finding.

In *Government of Virgin Islands v. Lake*, 362 F.2d 770 (3d Cir.1966), this Court addressed the elements of willfulness, deliberateness, and premeditation which must be established to prove first-degree murder:

> To premeditate a killing is to conceive the design or plan to kill. *State v. Anderson*, 1961, 35 N.J. 472, 173 A.2d 377, 389–390. A deliberate killing is one which has been planned and reflected upon by the accused and is committed in a cool state of the blood, not in sudden passion engendered by just cause of provocation. *State v. Roedl*, 1945, 107 Utah 538, 155 P.2d 741, 749. It is not required, however, that the accused shall have brooded over his plan to kill or entertained it for any considerable period of time. Although the mental processes involved must take place prior to the killing, a brief moment of thought may be sufficient to form a fixed, deliberate design to kill. *State v. Hammonds*, 1939, 216 N.C. 67, 3 S.E.2d 439, 445;

> *Keenan v. Commonwealth*, 1863, 44 Pa. 55, 56–57. See, also, *Bullock v. United States*, 1941, 74 App.D.C. 220, 122 F.2d 213, 214; 1 Wharton's Criminal Law and Procedure (1957) §§ 267, 268; 40 C.J.S. Homicide § 33.

362 F.2d at 776. The element of premeditation may be inferred from the circumstances surrounding the homicide. *Government of Virgin Islands v. Roldan*, 612 F.2d 775, 781 (3d Cir.1979).

Martinez submits that the evidence in the record does not establish premeditation. Factors casting doubt on Martinez's premeditation include the evidence that the victim was armed and intoxicated; that the victim came looking for Martinez and not vice versa; that an argument immediately preceded the shooting; and that three nights earlier the victim, intoxicated then also, had sought entry to the same house, told Martinez that he would kill him, and had then fired a shotgun several times in the air. These facts prove, Martinez argues, that he acted out of defensive fear, and not in the "cool state of the blood" necessary for first-degree murder. *Lake*, 362 F.2d at 776.

On appeal we are not to review the evidence independently, but are limited to determining whether there is substantial evidence, viewed in the light most favorable to the government, to support the verdict. *Burks v. United States*, 437 U.S. 1, 16–17, 98 S.Ct. 2141, 2149–50, 57 L.Ed.2d 1 (1977). The government presented evidence that Martinez had vowed to kill the deceased, had a gun, and had shot the deceased four times—two or three times from behind a wall, and one or two times at close range when he was lying on the ground. These elements support a finding of premeditation and deliberation.[1]

## III.

Martinez's second ground of appeal raises a more, perplexing question. He con-

---

1. The totality of these facts presents a reasonable case of predisposition. In light of this conclusion, we need not decide the government's contention that the final one or two shots, administered at close range after Gomez had fallen to the ground, are sufficient, standing alone, to establish willful, premeditated and deliberate murder. Appellee's Brief at 15.

tends that the prosecution's failure to disclose his confession violated his right to a fair trial. The confession, he argues, provided evidence that Gomez was carrying a gun at the time of the shooting. According to the evidence presented at trial, however, Gomez was only seen carrying a knife. Based on that version of the events in question, it seems quite unlikely that Martinez, who concededly had a gun and was behind a garden wall, felt threatened by Gomez when he shot him. But, with evidence that Gomez had a gun, the defense contends it could have made a far stronger argument that Martinez fired the fatal shots out of fear, and not in cold-blood, as first-degree homicide requires.

Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, a defendant has a constitutional right to disclosure from the prosecution of material exculpatory evidence. *See also United States v. Bagley*, — U.S. —, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (plural opinion); *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). *Bagley* declares that a defendant is entitled to a new trial where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 105 S.Ct. at 3384. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* The *Bagley* inquiry requires consideration of the totality of the circumstances, including possible effects of non-disclosure on the defense's trial preparation. *Id.*

Where a factual question is raised as to whether a *Brady* violation occurred, the defendant is "entitled to have it determined by the district court in a hearing appropriate to the factual inquiry." *United States v. Alexander*, 748 F.2d 185, 193 (4th Cir.

1984). As this Court held in *United States v. Dansker*, 565 F.2d 1262 (3d Cir.1977), *cert. dismissed*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978):

> Where the submission of written affidavits raises genuine issues of material fact and where, as here, the *Brady* claims are neither frivolous nor palpably incredible, an evidentiary hearing should be conducted.

*Id.* at 1264.

## A.

■ Application of the foregoing principles suggests that this case be remanded to the district court for an evidentiary hearing. If the evidence sought by Martinez had been disclosed, there appears to be a "reasonable probability" that the result of his trial would have been different. *Bagley*, 105 S.Ct. at 3384. Evidence that Gomez was carrying a gun would have enabled Martinez to argue that he was guilty of a lesser degree of homicide,[2] either because he shot in the "heat of passion" or out of fear of the victim, and thus did not act in a "cool state of the blood," *Lake*, 362 F.2d at 776, as first degree requires. To be sure, this theory could be undercut by the final shots Martinez fired into Gomez's prostrate body—the coup de grace, as the dissent characterizes it. Consequently, a jury might well have rejected this defense, and returned a first-degree verdict nonetheless. Yet, given Gomez's reputation for violence, his repeated threats on Martinez's life, and the fact that Gomez actively sought out Martinez on the night of the shooting, a second-degree defense based on the additional evidence that Gomez was also armed that night may have influenced the jury's assessment of Martinez's mental state.[3]

---

**2.** V.I.Code tit. 14, § 922 provides in relevant part:

    (a) all murder which—

      (1) is perpetrated by means of poison, lying in wait, torture or by any other kind of wilful, deliberate and premeditated killing, ... is murder in the first degree.

      (b) All other kinds of murder are murder in the second degree.

**3.** Thus, the final shots, though significant, do not necessarily foreordain a first-degree conviction. For example, should a jury, based on the additional evidence that Gomez was armed, determine that Martinez's initial shots were not premeditated, then it could equally conclude that the final shots, under the circumstances, were also fired in the heat of passion.

The dissent makes much of the fact that such a theory is not borne out by the record. But if Martinez's statement had been disclosed, the record arguably would have been different; it might well have included not only evidence that Gomez was armed, but other evidence uncovered as a result of the confession.[4] We cannot, of course, predict with assurance how the jury would weigh any new evidence, but the chance that it would have resulted in a verdict of a lesser degree of homicide would seem "sufficient to undermine confidence in the outcome." *Bagley*, 105 S.Ct. at 3384.

Moreover, there remain unresolved "genuine issues of material fact," *Dansker*, 565 F.2d at 1264, as to whether a *Brady* violation took place. First, it is not clear from the record whether Martinez's confession was reduced to writing by Detective Vigo, either contemporaneously or in any subsequent reports or memoranda. If it was reduced to some form of writing by one of the governmental agents, it would appear to fall within the literal terms of defense counsel's discovery request, which specifically asked for:

> All written or recorded statements or oral confessions or admissions, subsequently reduced to writing, summarized in police reports, made by the defendant, or copies thereof, within the possession, custody or control of the Government, the existence of which is known or by the exercise of due diligence may become known to the Government. This request includes statements made to witnesses other than police officers at any time the defendant was in custody.

If the suppressed information was specifically requested, review of its materiality must take that fact into account. In *Bagley*, the Supreme Court noted that where a specific request has been made, it is more likely that a prosecutor's failure to respond will have an adverse effect on "the preparation or presentation of the defendant's case." 105 S.Ct. at 3384.[5]

A second issue that requires further factual development is the extent of the information obtained from Martinez in the confession. This inquiry should include consideration whether, as a result of Martinez's confession, the government obtained other exculpatory evidence that it did not turn over to the defense.[6] The affidavit submitted by Andre Peterson, investigator for the Federal Public Defender, relates what Detective Vigo said Martinez confessed to him. It further states that Detective Vigo admitted that "this information" was relayed to Detective Brown and to Assistant U.S. Attorney Mr. Jones. Examination of Martinez, Vigo, Brown, and Jones might be helpful. Particularly where much of the substance of the affidavit has been admitted by the prosecution, it would appear to be improvident to close the inquiry without looking further into the substance and implications of the information. Absent testimony from the direct participants as to

---

The dissent places great emphasis on the probative value of these final shots, but we do not understand it to argue that the coup de grace requires a first-degree verdict as a matter of law. Nor could it plausibly make such an argument. Although the shots are concededly quite important, the jury is assigned the role of weighing such evidence against competing evidence. Indeed, even though Martinez did not present a second-degree defense, the district court in this case instructed the jury as to lesser degrees of murder, including a fatal shooting committed in the heat of passion.

4. The extent of information obtained from Martinez in the confession, as well as other exculpatory evidence it might have led to, should be explored by the district court at the evidentiary hearing. See infra at 307.

5. Even if the confession was not reduced to writing, the request for any of defendant's oral confessions may have been sufficiently specific to put the prosecution on notice, *see United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1976), and to contribute to the misleading effects of non-disclosure. *See Bagley*, 105 S.Ct. at 3384.

6. For example, Martinez's statement might have led the government to investigate the presence of the victim's gun, to locate the gun, or even to pursue further questioning of the victim's brother, who apparently carried away the knife, and may have carried away the gun.

what was confessed or discovered, it is difficult—perhaps impossible—to determine the materiality of that information to the degree of Martinez's culpability.

Finally, the record is scanty concerning the extent of the prosecution's knowledge of the confession. The only evidence consists of the affidavit, and Assistant U.S. Attorney Jones's admissions at oral argument that Detective Brown had been apprised of the information, and that Detective Brown, the case agent, sat at Jones's side during Martinez's trial.[7] While it has been suggested that Detective Brown's knowledge of the information is sufficient as a matter of law to establish a *Brady* violation by the government,[8] we need not reach that issue if the facts disclose, as the affidavit suggests, that the prosecutor was personally aware of the confession.

### B.

■ The prosecution raises a strong counterargument to Martinez's *Brady* claim when it contends that in this case the defendant himself knew of the exculpatory evidence. The only reason his counsel was unaware, the government insists, was because Martinez lied. Until the district court resolves the issues outlined above, though, the relevance of Martinez's untruthfulness cannot be determined.

In order to resolve this question, the district court should consider whether Martinez was incapable, for any reason, of communicating truthfully with his attorney. It is possible that Martinez may not have understood his English-speaking lawyer's role; this is suggested by his willingness to confess to a Spanish-speaking police officer before trial, but not to his own counsel, and by his comment to the judge about the attorney's power to convict him. If Martinez's situation proves to have been analogous to that of the defendant in *Nagell v. United States*, 354 F.2d 441 (5th Cir.1966), then Martinez's foreknowledge would not necessarily bar his *Brady* claim. In *Nagell*, the defendant received a new trial on a Fed.R.Crim.P. 33 "newly-discovered evidence" ground, despite the fact that he knew of the evidence prior to trial and concealed it from his attorney. The court fashioned an exception to the Rule 33 requirement where defendant "was suffering from a mental disorder that caused, if not compelled, him to [lie to his attorney]." 354 F.2d at 448–49.[9]

Assuming Martinez cannot make out a claim under *Nagell*, the effect of a defendant's untruthfulness on a *Brady* claim would be squarely presented. We decline to resolve this issue on the present record, although we can sketch the contours of the argument.

---

**7.** Prosecutor Jones stated at oral argument that he himself was not aware of the information. According to the affidavit, though, Detective Vigo stated that he relayed the information to the prosecutor. These statements raise an unresolved issue of fact, reflecting upon the knowledge of the prosecution, which can only be resolved in an evidentiary hearing.

**8.** *See, e.g., Martinez v. Wainwright*, 621 F.2d 184 (5th Cir.1980) (*Brady* applies even where the prosecutor was personally unaware of existence of evidence requested but it was available in medical examiner's office); *see also United States v. Auten*, 632 F.2d 478 (5th Cir.1980) (*Brady* applies where prosecutor failed to run FBI check on witness, and FBI check would have revealed requested information); *cf. Agurs*, 427 U.S. at 110, 96 S.Ct. at 2400 (prosecutor charged with knowledge of evidence in his file "even if he has actually overlooked it").

**9.** To the extent that Martinez's potential *Nagell* claim is founded upon his assertions of "cultur-

al differences" with his lawyer, it might also be construed as a claim of entitlement to court appointment of an Hispanic lawyer. However, the case law appears to foreclose any such claim. Although it is true that a defendant has a right to effective assistance of counsel, the Supreme Court has held that ineffectiveness cannot be inferred from the situation but must be supported by specific allegations of misconduct. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Moreover, it is clear that a defendant has no absolute right to choose appointed counsel, *see, e.g., Williams v. Nix*, 751 F.2d 956, 959–60 (8th Cir.1985), nor even a right to enjoy a "meaningful relationship" with counsel. *Morris v. Slappy*, 461 U.S. 1, 14, 103 S.Ct. 1610, 1617, 75 L.Ed.2d 610 (1983). Based upon these cases, it would appear that any cultural differences between Martinez and his lawyer are insufficient to excuse any voluntary decision by Martinez to lie to his counsel.

It could be contended that where evidence is material—defined by the Supreme Court in *Bagley* as meeting a reasonable probability that the outcome would be changed assuming disclosure by the government—only as a result of the defendant's lying to counsel, the defendant may not invoke *Brady* to win a new trial. Under this view, when making the materiality judgment, the court is limited to considering whether there is a reasonable probability that disclosure would have led to a different outcome even if the defendant had not lied to his attorney. Thus, a *Brady* violation would occur only where, assuming the defendant had been candid with his attorney, the nondisclosed evidence would still be of significant value to the defendant's case. The counterargument is that the *Brady* rule has little to do with lying, but instead aims to encourage desired prosecutorial conduct to promote fair trials. Further, denial of *Brady*'s protections to defendants who are not candid with their counsel, and indeed who lie in their testimony, appears to create a penalty for lying, which may vary depending on what charge the defendant faces at the time that material evidence is withheld.

### C.

While we merely note the complexities raised by a defendant's dishonesty, and await a more complete record before attempting to formulate any necessary rule, the dissent would go further and decide that Martinez has no right to a *Brady* claim under any circumstances.

The dissent concludes that no hearing is required, believing that where a defendant knows that he confessed to the police, he has no *Brady* right to have the substance of that confession disclosed, even if it is exculpatory and specifically requested. This conclusion would appear to be founded upon an expansive reading of *United States v. Starusko*, 729 F.2d 256 (3d Cir. 1984), and upon an assumption that a defendant necessarily knows of or has access to the substance of his or her confession. Both bases appear open to some question.

*Starusko* held only that where defense counsel had independently discovered before trial an exculpatory statement that the prosecution failed to disclose, there was no prejudice, and thus no adverse effect on defendant's fair trial rights. The language in *Starusko* upon which the dissent relies was, at best, only peripheral to its decision. Drawn from *United States v. Campagnuolo*, 592 F.2d 852, 861 (5th Cir.1979), that language states that "the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." But the holding in *Campagnuolo*, as in *Starusko*, did not rely on this statement, but rather on the narrow determination that the non-disclosure did not prejudice defendant's right to a fair trial. In *Campagnuolo*, the exculpatory material was disclosed, although not until the day before trial, and the defense counsel admitted that the defense was not prejudiced by the late disclosure. 592 F.2d at 861 n. 9.

In any event, the language taken from *Campagnuolo* does not apply to a request for the substance of a confession taken by the police. The police account of the confession is not "information which [the defendant] already has or, with any reasonable diligence, he can obtain himself." The assumption that a defendant has access to his own confession or statement overlooks both the possibility that a defendant may not have total recall of what he said to the police, especially if the statement was made under pressured circumstances, and the reality that a defendant cannot, absent disclosure, know what the authorities recorded or retained of what he said. Thus, it is difficult to say as a matter of law that a defendant will never need to know the substance of a confession in order to receive a fair trial.

Indeed, although not authority for deciding the constitutional claim under *Brady*, Fed.R.Crim.P. 16(a)(1)(A) illustrates the point that it cannot be assumed defendants will, without disclosure, know the information contained in their own confessions to

the police. Rule 16 was amended in 1966 to provide for discovery of a defendant's own statements and confessions, and extended to provide even more liberal discovery of such material in 1974. *See generally* 2 C. Wright, *Federal Practice & Procedure* § 251–53. It rests on the premises that some defendants are not aware of what they have confessed to police, and that knowledge of the substance of such confessions is often critical to a fair trial. In *United States v. Lewis*, 511 F.2d 798, 802 (D.C.Cir.1975), the court stated:

> Discovery of government evidence of relevant and incriminating statements made by a defendant to police is of the utmost importance to the preparation of the defense as it must be kept in mind that given the traumatic circumstances of arrest, the memory of a defendant as to exactly what occurred may well be hazy and defective. Even where a defendant's memory is crystal clear, it is not every defendant who chooses to tell his own attorney all that he remembers.

*Id.*

Our decision in *United States v. Maroney*, 319 F.2d 622 (3d Cir.1963), would seem to lend further support to the conclusion that in appropriate situations failure to disclose a requested confession, where exculpatory and material, may constitute a *Brady* violation. In *Maroney*, this Court held that the prosecution's withholding of a defendant's own statement concerning a witness's admission violated *Brady*, and warranted the granting of a writ of habeas corpus.[10] See also *United States v. Pa-*

*drone*, 406 F.2d 560 (2d Cir.1969) (new trial ordered where prosecution failed to disclose defendant's confession admitting guilt to defense counsel; court found nondisclosure prejudicial because defendant maintained innocence at trial). The dissent seeks to distinguish *Maroney* by noting that the *Maroney* court did not specifically address the issue of the defendant's knowledge. This would seem to beg the question, however, for if the *Maroney* Court had considered defendant's knowledge a bar to a *Brady* claim, it would have denied relief.

Nor can *Maroney* be distinguished by asserting that the *Brady* request there was specific while here it was not. There are two problems with this distinction. First, it assumes that Martinez's confession was not "reduced to writing," and therefore did not come within the defense's specific request. But the only support for this assumption is the prosecutor's statement at oral argument before this Court. It is not our role to find facts and resolve factual issues at the appellate level. Indeed, that is the basis for *Dansker*'s requirement of an evidentiary hearing by the trial court to resolve colorable claims of *Brady* violations. Second, the Supreme Court's recent pronouncement in *Bagley* would appear to refute any contention that the existence of a specific request *vel non* requires a different result. 105 S.Ct. at 3384. Under *Bagley*, the existence of a specific request must be taken into account, but it does not trigger any different legal analysis. *Id.*[11] Accordingly, without further factual find-

---

**10.** If *Starusko* is construed to stand for the proposition that the government is never obligated under *Brady* to turn over its records of a defendant's statements, it would appear to be at variance with *Maroney*. Even though *Maroney* was not cited to the *Starusko* panel and indeed has not been relied upon by any court for the point at issue, *but see Bagley*, 105 S.Ct. at 3396 n. 7 (Marshall, J., dissenting), we are obliged to ignore *Starusko* to the extent that it is inconsistent with the earlier *Maroney* opinion. *See O. Hommel Co. v. Ferro Corp.*, 659 F.2d 340, 354 (3d Cir.1981) (citing United States Court of Appeals for the Third Circuit, Internal Operating Procedures, Ch. VII, § C (1978)). If there is a conflict between *Maroney* and *Starusko*, only

the Court sitting in banc may make *Starusko* (and thus *Campagnuolo* ) the law of the Circuit. We are reluctant to construe *Starusko* in such a way that it would conflict with *Maroney*.

**11.** The dissent also seems to suggest that *Maroney* is somehow overruled by the statement in *Agurs* that the prosecution need not turn over all of its files to the defense. But holding *Brady* and *Agurs* applicable to defendant's statements would not open the prosecutor's entire file; it means only that where the prosecutor has knowledge of a defendant's statement that is exculpatory and material, that statement should be disclosed to defense counsel.

ings, we cannot conclude that Martinez, either by lying to his lawyer or by not making a specific request, has forfeited his *Brady* claim.

## IV.

In summary, there is sufficient evidence to support Martinez's conviction. As to his *Brady* claim, the district court's evidentiary hearing should take into account 1) whether the confession was reduced to writing either contemporaneously or in subsequent police reports or memoranda; 2) the scope of the information obtained from Martinez, and whether it led the government to any other evidence; and 3) the extent of the prosecution's knowledge of the confession. All of these factors will be appropriate elements in the court's application of the *Bagley* materiality standard. The court may then find it in order to consider the implications of Martinez's dishonesty, i.e., whether there is any excuse for his behavior, and whether his behavior is relevant to the materiality determination or any other aspect of a *Brady* claim. If it is determined that the *Brady* rule has not been violated, the judgment of conviction should of course be affirmed. *See, e.g., United States v. Downing,* 753 F.2d 1224, 1244 (3d Cir.1985).

The record before us does not portray Martinez in a favorable light. As found by both the majority and the dissent, the evidence introduced supported his conviction on first degree murder. Moreover, he fabricated an alibi defense and lied to the court. However blameworthy this conduct may be, though, it does not deprive Martinez of his constitutional rights, including his right to disclosure by the prosecution of exculpatory evidence. Adherence to the constitutional prerequisites for a fair trial is vital in all cases; it is especially critical where, as here, the alleged violation may have contributed to a sentence of life imprisonment without possibility of parole, "the penultimate sentence." *Solem v.*

*Helm,* 463 U.S. 277, 303, 103 S.Ct. 3001, 3016, 77 L.Ed.2d 637 (1983).

The matter will be remanded for action consistent with this opinion.

GARTH, Circuit Judge, dissenting:

Juan Martinez was charged with the willful, unlawful, and premeditated killing of Felipe Gomez in violation of 14 V.I.C. § 922(a)(1). He now appeals from his conviction and sentence of life imprisonment without parole for first degree murder, claiming that the evidence was insufficient to support a finding of premeditation, and that the district court abused its discretion in failing to order a new trial based on new evidence.

At the request of the court made at oral argument, counsel submitted a supplemental argument addressed to the question whether the government's failure to supply Martinez with this "new evidence"—Martinez's own statement which he allegedly made to police upon his arrest—constituted a violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The majority now remands for a *Brady* hearing.

This case is a classic example of an appellate court deciding not the case before it, but the case that it wishes were before it. The majority today takes a case of relatively straightforward fact and law, dresses it up with imagined issues and conjectured circumstances [1]—none of which appear in the record and few of which have even been raised before us—and crowns it with a legal theory which defies both logic and precedent.

Faced with a mandatory sentence which it finds unpalatable, the majority has constructed out of whole cloth an untenable and unsupportable *Brady* theory requiring the prosecution to provide a defendant with evidence that the defendant already possesses in order to support a self-defense theory which the defendant never offered. Moreover, there is no principled justifica-

---

1. *See, e.g.,* Maj. Op. at 307 (was discovery request reduced to writing?); *id.* at 307 n. 6 (did the victim have a gun?); *id.* at 309 (was confession made under pressured circumstances?).

tion for a *Brady* remand predicated upon a self-defense theory in light of the undisputed evidence that Martinez delivered a coup de grace by firing two additional shots into Gomez's back after Gomez had already been felled by two shots.

Implicitly recognizing the lack of justification for a *Brady* hearing, the majority has steadfastly declined to explain why it has remanded instead of affirming. Instead, the majority seeks to sweep the whole coup de grace episode under the rug by artfully claiming that because the totality of the evidence supports the jury's finding of premeditation "we need not decide the government's contention that the final one or two shots ... are sufficient, standing alone, to establish willful, premeditated and deliberate murder." Maj. Op. at 305 n. 1.

No matter how skillfully the majority softens, reinterprets, or ignores the facts of Martinez's actions, the coup de grace record as it stands leaves no room for an ersatz self-defense claim based on *Brady*. The majority engages in nothing less than judicial juggling to reach its desired result. It is primarily for this reason, even though there are other reasons that argue against remand, that I dissent from the court's decision which remands this case to the district court for a *Brady* hearing.

## I.

On March 4, 1984, at about eleven in the evening, Felipe Gomez was fatally shot four times. Gomez was found in front of Building # 4 of the Walter I.M. Hodge Pavillion in Frederiksted, St. Croix. Juan Martinez was charged with premeditated murder. Because the setting in which Gomez's murder took place is highly relevant to the issues which the majority now has created to support a remand, I think it is important to summarize the evidence leading to the majority's conclusion.

The evidence at trial disclosed that Building # 4 is a three-story dwelling with two apartments on the ground level on opposite sides of the entry way. Each of the ground floor apartments has a front door and a side door opening onto the back porch area. The two doors are separated by a decorative brick wall through which one can see, but which prevents access from the front of the building to the back or vice versa. In order to go from one side of the brick wall to the other, one must walk entirely around the building. According to a scale-drawn location plan of the housing project introduced by the government, this distance is either approximately 105 feet or 285 feet, depending upon the direction (left or right) around the building that one chooses.

The autopsy report on Gomez reflected four gunshot wounds. Gomez was shot twice in the front: once in the head and once in the upper chest. The other two bullets entered Gomez's back.

At trial, the government presented eyewitness testimony of the shooting. Miguel Lopez testified that he knew both Martinez and Gomez, and that on the night of the killing he had encountered Gomez walking towards Building # 4, were Martinez was staying in Lopez's ground floor apartment. Lopez testified that, from outside the building, he observed Gomez approach the front door and knock on it. He then heard the side door open and heard Martinez and Gomez argue through the designer brick work which separated the front of the building from the side door of the apartment. Lopez observed Martinez standing behind (inside of) the brick work wall. He then heard two or three shots ring out from Martinez's side of the wall, and saw Gomez fall to the ground. According to Lopez, Martinez then walked around the building and fired an additional two shots into Gomez's fallen body.

Another eyewitness, Bobbie Hersford, testified that he heard the three shots, went to his window, and observed a man whose face he could not see walk around to the front of Building # 4 and fire a shot towards the ground. A third eyewitness, Maria Francis, testified that she observed a man walk towards the front of Building # 4 and fire three shots at the ground.

Francis later identified Martinez as the man she had observed.

A police officer who arrived first at the scene testified that he observed Gomez's brother, Mario Rivera, trying to revive Gomez, but found no weapons at the scene.

Martinez testified to an alibi defense. Martinez maintained that he had left Lopez's apartment around seven in the evening and went first to his sister's house, and then to his father's house. Martinez's father, brother, and two sisters testified in corroboration of his story.

The jury returned a verdict of guilty of first degree murder. The district court judge sentenced Martinez on the same day to a mandatory sentence of life without parole.

## II.

We must uphold a verdict of guilty if there is substantial evidence, viewed in the light most favorable to the government, to support the verdict. *Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1977). The element of premeditation may be inferred from the circumstances surrounding the homicide. *Government of Virgin Islands v. Roldan*, 612 F.2d 775 (3d Cir.1979), *cert. denied*, 446 U.S. 920, 100 S.Ct. 1857, 64 L.Ed.2d 275 (1980); *Government of Virgin Islands v. Lake*, 362 F.2d 770 (3d Cir.1966), including the fact that the victim was unarmed.

The majority concludes that the evidence presented supports a finding of premeditation and deliberation. Maj. Op. at 305. Indeed, I suggest that this conclusion is mandated if for no other reason than that the evidence reveals that Martinez left the safety of his apartment and his secure position behind a brick wall to walk anywhere from 100 to 300 feet in order to shoot a wounded Gomez two more times. The conclusion of premeditation is plainly correct and one with which I completely agree.

The government in this case produced testimony that Martinez first shot Felipe Gomez from behind the sanctuary of a designer brick wall. Gomez was in front of the brick wall and Martinez was behind it. The government not only produced testimony that no weapons were found on Gomez's body, but it also adduced evidence that after firing the first shots, Martinez walked around the building complex (a distance of either 100 or 300 feet) in order to come out on the other side of the wall where Gomez was lying. Martinez then delivered the coup de grace by firing two shots into Gomez's back while Gomez was on the ground. These elements overwhelmingly support the jury's finding of premeditation and therefore first degree murder. *Govt. of the Virgin Islands v. Lanclos*, 477 F.2d 603, 606 (3d Cir.1973) ("Although the mental processes involved must take place prior to the killing, a brief moment of thought may be sufficient to form a fixed, deliberate design to kill."); *Wharton's Criminal Law and Procedure* (1957) Vol. 1 § 267, p. 564. ("... it is sufficient that only a moment elapsed between the plan and its execution, as long as the jury can conclude that there was some appreciable interval however small.")

The majority chooses not to reach the question whether the final shots administered at close range by Martinez, standing alone, support the jury's finding of premeditation. *See* Maj. Op. at 305 n. 1. Indeed, inasmuch as the totality of the evidence supports the jury's verdict anyway, the majority need not reach this issue in the context of its review of the sufficiency of the evidence. However, since the majority goes on to order a remand on its newly found *Brady* theory, which remand would serve no purpose unless *Martinez* had a valid defense which could have been materially aided by the undisclosed information, the majority cannot avoid confronting the issue of the final shots. Yet, the majority refuses to do so.

I suggest that the reason the majority does not address the coup de grace evidence is that it *cannot*. No self-defense claim could withstand the undisputed evidence that not only did Martinez shoot Gomez twice after Gomez was rendered harmless and hors de combat, but the record

discloses among other things that Gomez was shot *twice in the back.* With these stark facts revealed by the record, it is evident to me that the reason the majority prefers not to reach or address the question of whether Martinez's final action and shots defeat any self-defense claim is that the answer is foreordained: no such defense is supportable.

There being no "reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different," *United States v. Bagley,* —— U.S. ——, 105 S.Ct. 3375, 3384, 87 L.Ed.2d 481 (1985) (plurality opinion), according to the standard adopted by the majority, any *Brady* claim which Martinez might have based on self-defense is palpably frivolous and no evidentiary hearing is warranted. *United States v. Dansker,* 565 F.2d 1262, 1264 (3d Cir.1977), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978).[2]

Despite the uncontradicted coup de grace evidence, Martinez points to testimony of government witnesses to the effect that Gomez, the victim, had previously threatened to kill Martinez, that Gomez had on a prior occasion fired shots outside Martinez's residence, that Gomez was carrying a small kitchen knife on the night of the killing, and that Gomez's killing followed an argument. According to Martinez, this testimony could now support an inference that Gomez was killed in self defense. Under our standard of review, however, we must draw all inferences in the government's favor. The jury could properly find

that Gomez was unarmed when he was killed, that the murder was premeditated, and that Martinez shot Gomez twice after Gomez had fallen.

### III.

At trial, Martinez's only defense was an alibi defense. The court scheduled sentencing directly after Martinez was convicted. During allocution, at the sentencing proceeding, Martinez for the first time admitted that he killed Gomez but implied that he had been threatened by Gomez with a shotgun and knife.

Martinez's post trial confession took place in the following colloquy:

THE COURT: Will the defendant come forward, there being no reason to delay the sentencing in this matter?

THE DEFENDANT: Good afternoon.

THE COURT: This court is without an option, the jury having rendered its verdict. Therefore we will proceed with sentencing at this time.

. Miss Fleetwood or Mr. Conte, do you care to be heard?

ATTORNEY FLEETWOOD [counsel for Martinez]: Your Honor, in light of the mandatory penalty in this case there is really nothing that we could say that would affect the decision. Therefore I would not allocute.

THE COURT: Mr. Jones?

ATTORNEY JONES [Assistant U.S. Attorney]: I have nothing.

THE COURT: Juan A. Martinez, before the sentence of this court is im-

---

**2.** The majority, without a shred of record support, baldly speculates as to whether "Martinez fired the fatal shot out of fear, and not in cold-blood as first-degree murder requires." Maj. Op. at 306. Thus, having just concluded that it "need not decide" whether Martinez could possibly argue for self-defense, the majority seeks to have it both ways.

If the majority's unwarranted speculation that Martinez acted out of "fear" is intended as a putative self-defense theory for Martinez, it is simply irreconcilable with the majority's refusal to deal with the compelling coup de grace evidence.

On the other hand, if the majority is suggesting by its language that Martinez could have

made an argument for a reduced degree of homicide based on his fear or "heat of passion," such a theory is purely conjectural. There is not even a scintilla of evidence in the record that Martinez acted in the heat of passion when he shot Gomez. To the contrary, it is evident that the coup de grace shots had to have been fired in cold blood. Despite this, the district court judge did instruct the jury as to lesser degrees of murder, including a fatal shooting committed in the heat of passion (Transcript at 340). Thus the jury by its verdict rejected the very issue now suggested in the majority opinion.

posed, sir, is there anything you would care to say?

THE DEFENDANT: Yes, Your Honor.

\* \* \* \* \* \*

Of this time I would have say that I commit the crime, but the reason I done do it is because the brother of the man take the shotgun that he was wearing that night and the knife and go and hide it. That's what happened.

THE COURT: I'm sorry; I did not understand.

ATTORNEY FLEETWOOD: Your Honor, he is communicating new evidence in that he says now that he did commit the crime, that it was in self-defense, because the brother of the victim took a shotgun and knife that the victim had and hid it.

THE DEFENDANT: I talked to the detective, Vigo, and I tell him that I could pled guilty if he could get the shotgun and the knife that the man was wearing that night when I was sleeping and he went to the door to trick myself.

THE COURT: He went to the door to what, Mr. Martinez?

THE DEFENDANT: Huh?

THE COURT: He went to the door to what?

THE DEFENDANT: He went with a shotgun and a knife in he hand, a long knife so. It's not a big knife like he said yesterday. I was sleeping when the guy was coming in with a gun.

THE COURT: This person being Marco Antonio Rivera?

THE DEFENDANT: Yes, Marco Antonio Rivera take the shotgun and the knife, and go with it and hide it. I stay in the place, hide, to seek what's going on over there, but he opened the shot, and he take the shotgun, and then I was in the floor, and he take the knife and go with it. That's what happened.

I don't pled guilty, but I talk with Detective Vigo that he take it from them, I could pled guilty for myself, and I don't have no problems with the justice.

THE COURT: When did you talk to Detective Vigo?

THE DEFENDANT: Last week because I was lying to my lawyer, and I be trying to lying to her because she was giving me a lot of advice that, if I don't pled guilty, maybe she could find me in the First Degree Murder, and I still keep it in myself, but I couldn't hide it.

That's what happened; I talk to he.

THE COURT: Do you have anything else, sir?

THE DEFENDANT: No.

THE COURT: Remain where you are for a moment. Counsel for the defendant have anything they care to record at this time?

Do you want sentencing suspended so that you can investigate these matters?

ATTORNEY FLEETWOOD: We do, Your Honor, and I would anticipate filing a motion for a new trial.

THE COURT: Yes, sir?

ATTORNEY JONES: Your Honor, I'm assuming he's saying that the decedent had the shotgun.

THE COURT: He's saying that Marco Antonio Rivera had a shotgun and a large knife, I believe—is that correct?

THE DEFENDANT: yes.

The man who—who get killed by myself; right, because I submit that I do it—he was coming to the door. I was sleeping. He was beating in the louver with a knife. When he opened the window he got a shot gun in he hand. I know what is a shotgun. I just tell he, "Please go to sleep. You got your mother. My mother is dead. Go behave. Behave yourself."

As I open the door, he try to grab me. That's what happened; I fire after he.

THE COURT: This is Mr. Philipe Gomez you're talking about?

THE DEFENDANT: Yes.

After that I went and hide, and I saw police somewhere come and take the

shotgun from him and the knife that be on the floor.

App. 143–47.

Martinez then asserted his own "confession" as evidence discovered after trial requiring a new trial under Fed.R.Crim.P. 33. The court correctly denied the motion. To support a new trial, evidence must be truly "newly discovered." *United States v. Iannelli*, 528 F.2d 1290, 1292–93 (3d Cir.1976). Evidence known to the defendant prior to trial is not newly discovered. *States v. Bujese*, 371 F.2d 120 (3d Cir.1967). Any self-defense claim as Martinez appears now to assert obviously was known to Martinez prior to trial. Indeed, his own statements at allocution attest to that fact. The majority does not reach Martinez's new evidence argument, apparently finding it more creditable recast as a *Brady* issue. Indeed, the new evidence argument is plainly meritless.

### IV.

In addition to his newly discovered evidence claim, Martinez claims that the government's failure to inform defense counsel of statements made by Martinez to Officer D. Vigo was in violation of the requirement that the government turn over to the defense exculpatory evidence within its possession. *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[3] According to Martinez, knowledge of these statements would have materially aided defense counsel in preparing his defense. Specifically, Martinez asserts that knowledge of

these statements, combined with the evidence that Gomez *may* have been armed,[4] would have prompted defense counsel to present an argument of self defense rather than the alibi defense actually presented. Even accepting Martinez's assertion that the statements he made to Officer Vigo were both exculpatory and material to his defense, his *Brady* claim must nonetheless fail for the simple reason that the information sought—Martinez's own statements— was already in the possession of Martinez the defendant. *See United States v. Starusko*, 729 F.2d 256, 262 (3d Cir.1984); *United States v. Dansker*, 565 F.2d 1262, 1265 (3d Cir.1977), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

With all due respect to my colleagues in the majority, that is all there is to this case. The rest is all sandcastles constructed by them out of grains of speculation and conjecture in order to justify a remand. The majority holds that *Brady* may be applied to require the government to turn over to a defendant or his attorney information, such as the defendant's own statements, which the defendant already possesses. This holding is contrary to the jurisprudence of our sister circuits [5] and properly reflects neither the law of this circuit nor the facts of this case.

### A.

To support its legal argument, the majority cites *United States v. Maroney*, 319 F.2d 622 (3d Cir.1963), in which defendant had related to the police a witness's version of the killing, which included a description of a struggle the defendant had with the

---

**3.** Martinez relies on two statements he made to Officer Vigo prior to trial as reported by Vigo to an investigator for the Federal Public Defender:
   "I would plead guilty of killing Felipe Gomez if you could find the shotgun that he had;"
   "What happened was, I, Juan Martinez, was in Miguel Lopez' apartment, #50 Walter I.M. Hodge Pavillion Project, and he, Felipe, came with a shotgun and a knife saying he wanted to kill me, so when he pointed the shotgun at me, I shot him."
   Affidavit of Andre D. Peterson. App. 14A.1–2.

**4.** We observe that in one portion of Martinez's statement he claimed that the brother of Gomez

took and concealed the shotgun and the knife that he contends Gomez had with him. In the latter part of his statement, he claims "I saw police somewhere come and take the shotgun from him and the knife that be on the floor."

**5.** *See, e.g., United States v. Cravero*, 545 F.2d 406, 420 (5th Cir.1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1123, 51 L.Ed.2d 549 (1977); *Maglaya v. Buchkoe*, 515 F.2d 265, 268 (6th Cir.), *cert. denied*, 423 U.S. 931, 96 S.Ct. 282, 46 L.Ed.2d 260 (1975); *Williams v. United States*, 503 F.2d 995, 998 (2d Cir.1974).

victim of his shooting. Though a copy of this statement was in court during examination of the witness, defense counsel was not permitted to examine it, despite the defendant's specific request.

In *Maroney*, this court held that failure to furnish the statement and therefore to disclose the evidence of "struggle" denied defendant a fair trial and thus due process. Significantly, although *Maroney* was decided some few months after the Supreme Court announced its decision in *Brady*, no analysis of the application of the *Brady* rule to material known to defendant appears in the opinion. Nor has *Maroney* ever been cited for the proposition that *Brady* requires disclosure of a defendant's own statements. Indeed, this court affirmed a district court opinion which found *Brady* and *Maroney* to be "not in point" because the content of the information in question was "well known" to the criminal defendant. *Pugliano v. Staziak*, 231 F.Supp. 347, 354 n. 10 (W.D.Pa.1964), *aff'd per curiam*, 345 F.2d 797 (3d Cir.1965).[6]

Since *Maroney* was decided, the Supreme Court, in *United States v. Agurs*, has given us guidance in applying the *Brady* rule where, as here and unlike *Maroney*, no specific request for the information was made by the defense.[7] In *Agurs*, the

Supreme Court was careful to avoid a requirement that the prosecution must turn over all of its files to the defense; rather, the Court held, only information the lack of which would deprive the defendant of a fair trial, need be disclosed.[8]

It offends reason to hold that a defendant is denied a fair trial simply because the prosecution fails to turn over to the defendant or his counsel information that the defendant himself possesses. The fifth amendment guarantees a fair trial to the defendant—not to his attorney. Moreover, the Supreme Court, when it decided *Brady*, was not concerned with, and did not address, Brady's duties and obligations. It fashioned the *Brady* doctrine only with respect to the duties and obligations that the government owes to the defendant.

Thus, *Brady* and its progeny require only that the government disclose information to the defendant where the defendant does not possess or know that information, and would thereby be denied a fair trial. *Brady* does not concern information of which the defendant has knowledge and which the defendant discloses to the government, because in that situation the defendant has not been unfairly disadvantaged if the government knows of the information or uses it.

---

**6.** *United States v. Padrone*, 406 F.2d 560 (2d Cir.1969), also relied upon by the majority, is also inapposite. Although the court in *Padrone* ordered a new trial because the government had failed to provide defendant with a copy of his statement to the United States Attorney, no mention was made of *Brady* in the court's per curiam opinion. Instead, the case appears to have been decided on non-constitutional discovery grounds. Padrone had specifically requested the statement, and the court had ordered it produced. Moreover, unlike this case, where the statement in question was not used by the government, the prosecution in *Padrone* had used defendant's statement to impeach him on the witness stand. Therefore, defendant suffered actual prejudice in the preparation for and conduct of his trial.

**7.** Martinez did file a formal request for "all written or recorded statements or oral confessions or admissions, subsequently reduced to writing, summarized in police reports, made by the defendant...." Request for Discovery and Inspection. ¶ 1. However, the statements made by Martinez did not come within the

terms of Martinez's demand as they were not "reduced to writing."

**8.** *United States v. Bagley*, —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) does not change the *Brady* standard. The requirement that a new trial be provided when under "the totality of the circumstances" it appears that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," *id.* at 3384, goes only to materiality. This language does not create a *Brady* issue where defendant's prior knowledge of the information sought makes *Brady* inapplicable. To the extent that *Bagley* can be read as broadening our inquiry under *Brady*, however, I would only note that the language quoted by the majority opinion as speaking for the Court in *Bagley* comes from a portion of Justice Blackmun's opinion joined only by Justice O'Connor. These portions of *Bagley* are therefore not appropriately cited to establish what "the Court" requires.

Accordingly, *Brady* has no application to the circumstances of Martinez's conviction in this case. Here Martinez admittedly knew of the actions that he, Martinez, had taken with respect to Gomez and of Gomez's purported possession of weapons. He informed Detective Vigo of that information. Detective Vigo, perforce, knew that the information was known to Martinez. Martinez now complains that *Brady* is implicated because Vigo failed to relate this information back to Martinez and his attorney. Such a construction distorts *Brady* and stands the entire doctrine on its head.

This court, until now, has rejected such a tortured extension of *Brady*. In *United States v. Starusko*, 729 F.2d 256 (3d Cir. 1984), we found no *Brady* violation where the defendant independently obtained the information sought prior to trial. In *United States v. Dansker*, 565 F.2d 1262, 1265 (3d Cir.1977), *cert. denied* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978), while remanding an alleged *Brady* violation to the district court for a hearing, we specifically noted that those defendants who actually possessed the exculpatory information prior to trial, yet failed to present it, would not be able to assert a *Brady* claim.

As we stated in *Starusko*, "the government is not obliged under *Brady* to furnish a defendant with information he already has or, with reasonable diligence, he can obtain himself." 729 F.2d at 262 (quoting *United States v. Campagnuolo*, 592 F.2d 852, 861–62 (5th Cir.1979)).[9] *Accord, United States v. Griggs*, 713 F.2d 672, 674 (11th Cir.1983); *United States v. Young*, 618 F.2d 1281 (8th Cir.1980) ("The government is under no obligation to disclose to a defendant what he already knows," so per-

sonal knowledge of the defendant bars a *Brady* violation.), *cert. denied,* 449 U.S. 844, 101 S.Ct. 126, 66 L.Ed.2d 52 (1980). Here, it is not disputed that any statements Martinez made to officer Vigo were known to Martinez and in the possession of Martinez himself. Martinez may not place upon the government responsibility for his own failure to make full disclosure to his trial counsel.[10]

### B.

In the face of the foregoing law and logic, the majority holds that a hearing is nevertheless necessary to determine if appellant's *Brady* rights were violated. The majority suggests that disclosure to Martinez's counsel of Martinez's confession might have led to a different trial strategy, a possible self-defense argument, or conviction on a lesser included offense. The majority also offers a host of factual questions said to bear on the *Brady* question and therefore to necessitate a remand. In so doing, the majority departs radically from the record below and brings an entirely different and hypothetical case into existence.

The majority identifies three specific areas in which factual inquiry is necessary with respect to Martinez's *Brady* claim. First, the majority holds that a remand is necessary to determine whether or not Martinez's confession had been "reduced to writing," thereby bringing it within the terms of Martinez's specific discovery request. This issue was not raised below, and there is no evidence to contradict the government's representation that appellant's statement was not reduced to writ-

---

**9.** The majority suggests that to the extent that *Starusko* holds that the government has no obligation to turn over to defendant his own statement it is in conflict with the earlier *Maroney* opinion and therefore must be ignored. See at 310 n. 10. However, as noted above, *supra* at 317, *Maroney* has never been relied on for its Brady analysis and is in fact distinguishable.

**10.** It was represented to us at oral argument that investigation revealed that no record had been made of the "exculpatory" statements, and

Martinez does not argue to the contrary. Indeed, had the information imparted to Vigo been deemed of any significance or consequence by the government and had it been known by the government, the government unquestionably would have confronted Martinez on cross examination with his prior statement that he was present and was threatened by Gomez—a statement directly contradicting Martinez's alibi testimony.

ing. *See* note 7 *supra.*[11] In fact, Martinez does not argue or even *suggest* on this appeal that any written record was made of his statement. More important, this factual question is irrelevant to any issue actually before us. The majority finds the question significant in evaluating the "materiality" of the government's failure to provide appellant with his own statement, i.e., what effect it had on the preparation of Martinez's case and the fairness of his trial. The materiality inquiry, however, presumes the existence of a *Brady* issue in the first place; it cannot create one where the defendant's own knowledge makes *Brady* inapplicable.

Second, the majority holds that on remand the district court must determine the extent of the information obtained from Martinez and whether the confession led to further investigation and the discovery of other possibly exculpatory evidence. Here, again, the majority freely speculates: Did the victim have a gun? Where was it? Did the victim's brother seek to remove it? *See* Maj. Op. at 307 n. 6. These issues were not raised below, nor indeed have they been raised before us by Martinez. None of the eyewitnesses testified as to any gun in Gomez's possession. The only evidence to support these issues is the statement of Martinez himself, which he chose not to put into evidence at trial. A remand on this question would merely be a license for Martinez to engage in a speculatory expedition for exculpatory evidence that the majority guesses might be out there somewhere; it would have little to do with the case actually before us.

Third, the majority orders a remand to determine the extent of the prosecutor's knowledge of Martinez's confession. As the majority notes, in the presence of a

true *Brady* violation, it probably does not matter if the prosecutor is personally aware of the exculpatory information, so long as he *should* have been. *See* cases cited in majority opinion, at 308 n. 8. The extent of the prosecutor's personal knowledge, when it is not disputed that a detective with personal knowledge of the confession sat at the prosecution table at trial, is therefore irrelevant to any *Brady* issue in this case. The question is doubly irrelevant when the defendant's own knowledge simply renders *Brady* inapplicable.

In addition to the irrelevant materiality questions outlined above, the majority requires remand to investigate "the relevence of Martinez's untruthfulness." Maj.Op. at 308. The majority instructs the district court to consider whether Martinez was incapable of communicating with his attorney, noting that Martinez spoke little English and may have distrusted his English-speaking lawyer. While apparently accepting the undisputed facts that Martinez knew about his own confession and chose to lie to his attorney and to the court in fashioning his alibi defense, to which his father, brother and two sisters also testified, the majority nevertheless suggests that Martinez's knowledge may not bar his *Brady* claim. The majority is unclear as to what the district court must find on remand in order to conclude that Martinez may assert a *Brady* claim despite his personal knowledge of the information allegedly withheld by the prosecution. Presumably, however, it would involve a finding that Martinez was somehow *justified* in lying to his attorney and that therefore Martinez's lie now imposes a duty upon the prosecution to disclose his confession. Precisely what would constitute this justification is also left unclear, but again one can

---

**11.** I am puzzled by the majority's references throughout its opinion to the discovery requirements of Fed.R.Crim.P. 16 which, of course, would only apply if Martinez's statements had been reduced to writing or otherwise recorded. Under Rule 16(a)(1), even if a defendant knows of the existence of his statement, when such a statement has been recorded he may still need to obtain a copy of it in order adequately to prepare his defense to withstand impeachment.

Where, as here, there is no evidence that a record was made or exists of a defendant's statement, there is also no danger of such a statement being used to impeach the defendant's credibility. In fact, no such impeachment was attempted in this case. *See* n. 10 *supra.* Therefore, the rationale of Rule 16 is not implicated in this case. Moreover, no Rule 16 issue is even present in the record before us.

.

only presume, despite the majority's disclaimer, (Maj.Op. at 308 n. 9) that it includes "cultural differences" between defendant and attorney. On remand, therefore, the district court under the majority's mandate must somehow distinguish between two kinds of lying: that which is "justified" and creates a *Brady* claim where a defendant's knowledge would otherwise bar one, and that which is "unjustified" and gives rise to no special rights. Such a distinction, however, is clearly untenable.

First of all, the majority does not and cannot suggest that a "justified" lie is any less a lie than the lie interposed for "bad" reasons. The majority's implied formulation simply makes no sense. A lie is a lie is a lie, regardless of motivation or culpability. If Martinez lied, then perforce he knew that he was telling untruths and concealing other facts, including the existence of his confession. If, in turn, he knew about his confession, as he unquestionably did, then there was no *Brady* violation.

Even if there were some relevance to the question of appellant's motivation in concealing facts from his attorney, the distinctions between kinds of lies are far too subjective and elusive to be addressed in an evidentiary hearing. How can a district judge decide why a defendant lied?

Moreover, the potential justification for Martinez's lying—the postulated cultural differences between Martinez and his attorney—presents a dangerously broad and amorphous ground for upsetting a judgment. The majority recognizes this and rejects the claim in virtually the same breath that it raises it. *See* Maj. Op. at 308 n. 9. The majority further suggests

that appellant's case may be analogous to that of the defendant in *Nagell v. United States,* 354 F.2d 441 (5th Cir.1966). In *Nagell,* a new trial was granted to defendant on the basis of "new evidence" when defendant's organic brain injury resulted in a failure to disclose evidence to his counsel of which defendant was aware prior to trial. However, the defendant in Nagell was *incapable* of conveying the information to his attorney because of his mental disorder. This stands in sharp contrast to the present case, where appellant claims no mental defect but merely "cultural differences" and undifferentiated distrust, and simply *chose* to lie to his counsel.[12] The majority apparently recognizes that Martinez may not, on remand, be able to satisfy *Nagell,* and in fact rejects the Nagell argument to the extent that it is based on "cultural differences"—the only conceivable basis available in this record. Maj. Op. at 308 and 308 n. 9.

In justifying a remand, the majority thus engages in a deftly choreographed double-bootstrap. On the one hand, the majority seems to reject Martinez's alleged justifications for failing to tell his attorney about his confession. It is only these justifications that would give rise to a *Brady* obligation on the part of the government. Remand is nevertheless ordered because of the factual inquiries on materiality discussed earlier in the majority opinion. These inquiries, however, are totally irrelevant unless and until a *prima facie Brady* claim is made out. The majority therefore creates materiality issues dependent on the existence of a *Brady* issue, identifies no plausible basis for a *Brady* issue, and re-

---

12. Appellant makes no claim of ineffective assistance of counsel, although there is an implicit suggestion in the majority opinion that would indicate that we should consider such an argument among the other "claims" which the majority has now created. Again, nothing in the record supports such a claim. In *Morris v. Slappy,* 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983), the Supreme Court rejected a claim that the Sixth Amendment guaranteed the right to a "meaningful relationship" between defendant and counsel, in the absence of evidence that

counsel was unable to prepare adequately for trial. *Id.* at 12–14, 103 S.Ct. at 1616–17. Similarly, that Martinez may have lacked rapport with his counsel or distrusted her does not give rise to an ineffective assistance claim where nothing in the record shows that counsel was prevented from doing a competent job on his behalf. Short of such a genuine ineffective assistance claim, "cultural differences" between defendant and counsel cannot be cognizable in this court.

mands anyway because of the materiality issues.

If the majority's analysis and decision is to become the law of this circuit, it will undoubtedly lead to requests for remand in every case in which a defendant has taken the stand. While I do not argue that every criminal defendant who takes the stand lies, I think it is acknowledged that criminal defendants who testify frequently take liberties with the truth.

Under the majority's thesis, it would not surprise me therefore to find that defendants who after conviction claim that their testimony was not the whole truth, would now seek a remand for an evidentiary hearing, citing as authority the remand granted in the instant case of Martinez, who not only lied but admitted to his falsehood directly after conviction. In each such instance, I can foresee the argument that evidence on remand must be adduced to satisfy the various factors outlined by the majority in this case. Indeed, I would expect that every defendant who testified in his own trial to the effect that he was not guilty of the charges against him but was nevertheless convicted by jury, would be in a position to claim that because the jury had convicted him (i.e. not believed him), his "lie" warranted a remand for an evidentiary hearing. *Cf. United States v. Grayson*, 550 F.2d 103 (3d Cir.1976), *rev'd*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978); *Poteet v. Fauver*, 517 F.2d 393 (3d Cir.1975).

As the majority itself notes, *see* Maj. Op. at 309, the *Brady* rule has little to do with lying. To see just how far afield the majority strays in its ruminations about appellant's lying and its speculations about facts not in the record before us, it is helpful to focus on that with which the rule is concerned. As this court noted in *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir.1984):

> There can be no violation of *Brady* unless the government's non-disclosure infringes the defendant's fair trial right .... to constitute a *Brady* violation, the

non-disclosure must do more than impede the defendant's ability to prepare for trial; it must adversely affect the court's ability to reach a just conclusion to the prejudice of defendant.

The Second Circuit has made an excellent statement of the purposes of the *Brady* rule:

> In a recent case, *Moore v. Illinois*, 408 U.S. 786, 794, 92 S.Ct. 2562 [2567], 33 L.Ed.2d 706 (1972), the Supreme Court reiterated that "[t]he heart of the holding in *Brady* is the prosecution's *suppression of evidence*, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment." (Emphasis supplied). In the context of the Brady requirement "any allegation of suppression boils down to an assessment of what the state knows at trial in comparison to the knowledge held by the defense." *Giles v. Maryland*, 386 U.S. 66, 96, 87 S.Ct. 793, 808, 17 L.Ed.2d 737 (White, J., concurring).

\*  \*  \*  \*  \*  \*

> The purpose of the *Brady* rule is not to provide a defendant with a complete disclosure of all evidence in the government's file which might conceivably assist him in preparation of his defense, but to assure that he will not be denied access to exculpatory evidence known to the government but unknown to him.

*United States v. Ruggiero*, 472 F.2d 599, 604 (2d Cir.), *cert. denied*, 412 U.S. 939, 93 S.Ct. 2772, 37 L.Ed.2d 398 (1973)

It matters not whether or why defendant lied. The speculations of the majority notwithstanding, the facts of this case are simple and undisputed: Martinez, for whatever reason, *chose* to keep his guilt and prior admission of guilt from both his attorney and the court. That he raised the confession at sentencing shows that he was all too aware of it; that he only revealed it at that time shows that he intentionally

concealed it as part of his strategy to present a false alibi defense.[13]

Indeed, not only did Martinez lie—he obviously also encouraged his father, his brother, and his two sisters to corroborate his falsehood. Any suggestion that Martinez did not remember or was unable to convey to his attorney the facts which form the matrix of his confession is a pure flight of fancy. In this context, the values of *Brady* are not served by requiring prosecutorial disclosure of evidence that the defendant was intentionally suppressing. *Brady* is a rule of fairness for defendants, not a device to force defendants to be honest with their lawyers. Where a defendant choses not to provide his lawyer with information, the failure of the government to provide the same information, which it had received from the defendant himself, cannot possibly infringe that defendant's right to a fair trial.

## V.

I hope it is clear from the foregoing section that I am firmly convinced that no *Brady* issue exists in this case. Even if I were to conclude, however, that Martinez's knowledge of his own confession does not bar a *Brady* claim, and even if his confession were construed as exculpatory, I fail to see how this "new" information would be either relevant or material to Martinez's hypothetical self defense claims.

As Martinez apparently concluded when he decided to proceed with a fabricated alibi defense, the overwhelming evidence of premeditation in this case would negate any self-defense claim that Martinez could have based on his statement to the police. Indeed, a cursory review of the evidence adduced at trial reflects the inherent implausibility of the majority's suggestion that such a defense would have been possible.

The evidence showed that Martinez chose to emerge from the sanctuary of his friend's apartment to confront Gomez who was at the other side of a brick wall. From behind the protection of this brick wall, Martinez shot Gomez who, whether unarmed or "armed" with a three-inch kitchen knife, could present no threat at all. Even if these events could give rise to a self-defense claim, such a theory is shattered by the evidence that Martinez then walked *all the way around the apartment building* to deliver the coup de grace—two final shots into Gomez's back as he lay on the ground.[14]

Even if Martinez's statement that Gomez was carrying a gun—a statement which Martinez chose not to enter into evidence and which is corroborated by nothing in the record—were given credence on remand, the coup de grace evidence in this case clearly defeats any self-defense claim that Martinez might make. Therefore, even if a *Brady* issue involving a self defense claim properly appeared in this case, I would hold that Martinez had suffered no prejudice by the government's failure to acquaint him with his own confession.

**13.** The majority claims that Martinez might have been "pressured" into making his confession to Sgt. Vigo. Maj. Op. at 309. The record is completely barren of any support for this gratuitous suggestion. Not even during the sentencing colloquy which took place *after* the jury convicted Martinez did Martinez contend that pressure had been exerted upon him. The mere suggestion of such a claim or argument, when not a shred of evidence exists to support it, reveals the skewed nature of the majority's reasoning and disposition.

**14.** Title 14 § 43 of the Virgin Islands Code provides that self defense may not extend to the infliction of more harm than is necessary for the purpose of defense and that there must be a reasonable ground on the part of the defendant to believe that at the time the deceased was killed he, the defendant, was in imminent or immediate danger of his life or great bodily harm. Moreover, it is well settled that if the defendant has retreated and is out of danger and then renews the attack, he loses the right to claim self defense. Wharton's Criminal Law (14th Ed.1979) § 126 Volume II, p. 1320.

As the evidence clearly reveals, not only was Martinez shielded behind a brick wall and therefore in no danger from Gomez, but after Martinez had shot Gomez, he then continued to press his attack by walking around the building to deliver one to three additional shots. As previously stated, the record reveals that Gomez was shot twice in the back.

Indeed, the evidence of the coup de grace puts the lie to the majority's claim that, under *Bagley*, disclosure of Martinez's statement made to Detective Vigo would have led to a "reasonable probability" of a different outcome. Maj. Op. at 309. It also dispels any notion that had Martinez "been candid with his attorney, the non-disclosed evidence [of purported self-defense] would still be of significant value to [his] case." *Id.* Under no scenario could a self-defense claim be hypothesized which would withstand the undisputed facts of the last shots fired into Gomez's body.

## VI.

At first blush, it might seem that little harm could be done by a remand in this case. To the contrary: in order to justify a remand, the majority has been compelled to distort beyond recognition the jurisprudence of *Brady v. Maryland* and to ignore the factual record before us. Moreover, by so holding, the majority has been obliged to pervert the elements of the doctrine of self defense. The court also requires the district court to undertake the quixotic task of sorting out different kinds of lies and attaching different constitutional significance to each. I know that if I were the district court judge, I would not have the remotest notion of how to go about implementing the mandate of the majority opinion. I suggest that distinguishing between a "justified" and an "unjustified" lie, in addition to ascertaining the answers to the other inquiries required by the court's remand in the context of this case, would be a Sisyphean task for any jurist.

From the majority's opinion, it appears that the real reason for today's holding is the majority's abhorrence of the "penultimate" sentence of life without parole which Martinez faces. *See* Maj. Op. at 311.[15] The majority also seems to feel

that to affirm appellant's conviction would be to "punish" him for lying. *See* Maj. Op. at 309 ("denial of *Brady*'s protections to defendants who are not candid with their counsel, and indeed who lie in their testimony, appears to create an arbitrary penalty for lying....").

Martinez was not sentenced to life in prison for lying, and his conviction can be affirmed now without reference to whether he lied. Martinez was tried, convicted, and sentenced for the cold-blooded murder of Felipe Gomez. Accused murderers who lie, to be sure, are still entitled to the protection of *Brady*, to the full panoply of constitutional rights, and to a thorough review by this court. Once we have determined that Martinez's rights were honored, however, it is not our function to second-guess the wisdom of the Virgin Islands legislature in imposing harsh punishments in order to deter crimes of violence, at least in the absence of any claim that such a punishment is, itself, cruel and unusual.

The undisputed facts show that Martinez possessed the very information which he now claims the government should have given him. His rights under *Brady* were not violated. No unresolved issues of material fact exist. Any *Brady* claim in light of this record is palpably incredible. *United States v. Dansker*, 565 F.2d 1262, 1264 (3d Cir.1977), *cert. dismissed*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). The outcome of Martinez's trial could be, and would be, no different under *United States v. Bagley*, —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Therefore, no purpose can be served by a remand.

The only appropriate disposition of Martinez's appeal is to affirm the conviction and sentence imposed by the district court.

For the foregoing reasons, I respectfully dissent.

---

**15.** In 1974, the Virgin Islands legislature amended 14 § 923(a) to provide for imprisonment for life (of a first degree murderer) without parole. Prior to the amendment, the punishment for first degree murder was life imprisonment. While I recognize that where a statute contains a mandatory life imprisonment term, the statu-

tory language must be narrowly construed, *see Government of the Virgin Islands v. Berry*, 604 F.2d 221, 228 (3d Cir.1979), we at no time have ever intimated, nor could we, that where such a penalty is prescribed it may be avoided because of its severity.