282 N.J. Super. 86 (1995)
659 A.2d 514
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
DALE A. YOTHERS, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 12, 1995.
Decided June 15, 1995.
*87 Before Judges SHEBELL, SKILLMAN and WALLACE.
Charles M. Ouslander argued the cause for appellant (Maryann K. Bielamowicz, Mercer County Prosecutor, attorney; Loni M. Hand, Mr. Ouslander, of counsel, and on the brief).
Jacqueline E. Turner, Assistant Deputy Public Defender, argued the cause for respondent (Susan L. Reisner, Public Defender, attorney; Ms. Turner, of counsel, and on the brief).
Catherine A. Foddai, Deputy Attorney General, argued the cause Amicus Curiae (Deborah T. Poritz, Attorney General, attorney; Ms. Foddai, of counsel, and on the brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
This case involves the limited issue of whether the death penalty may be imposed for purposely or knowingly causing serious bodily injury resulting in death where the offense occurred after adoption of the State constitutional amendment declaring such punishment not cruel and unusual punishment, but before the amendment of N.J.S.A. 2C:11-3 to expressly provide that SBI murder may support a death sentence. We conclude that it may not, and affirm the order under review.
The double homicide in question occurred on the morning of February 1, 1993. On March 18, 1993, the police arrested defendant, Dale A. Yothers, and his roommate, Christopher Walsh Jr., in connection with the slayings. While in custody, defendant admitted his involvement and asked for the death penalty.
*88 On September 17, 1993, defendant and Walsh were charged in an indictment with attacking, robbing, and killing the two victims on February 1, 1993. At defendant's arraignment, the State served him with notice of aggravating factors weighing in favor of imposing the death penalty. See R. 3:13-4. On February 27, 1995, immediately before the commencement of jury selection, the State requested that the trial judge instruct prospective jurors that a defendant may be found guilty of capital murder for either purposely or knowingly causing death or for purposely or knowingly causing serious bodily injury (SBI) resulting in the death of another. The judge, reasoning that the statutory amendment was not in effect at the time of the homicides, refused to instruct the jury that capital punishment could be imposed for purposely or knowingly causing SBI resulting in death. We granted the prosecutor's request for a stay and for leave to appeal. This expedited appeal followed.
In State v. Gerald, 113 N.J. 40, 549 A.2d 792 (1988), a case in which the evidence supported a conviction for either purposeful or knowing murder (hereinafter intentional murder) or purposeful or knowing infliction of serious bodily injury resulting in death (hereinafter SBI murder), the Supreme Court held that capital punishment for SBI murder was unconstitutional, as violative of the New Jersey Constitution's Cruel and Unusual Punishment Clause. Id. at 89, 549 A.2d 792.
Relying on the statements of Senator John Russo, the chief sponsor of the death penalty statute, the Court also noted that the legislative history of the statute indicated that those found guilty of SBI murder were not intended to be eligible for the death penalty. Id. at 89-90, 549 A.2d 792. Contrary to the dissent's assertion that the Court's analysis of the legislative history was intended to legitimize the Court's narrowing of the statute, the Court referenced the legislative history to demonstrate that a narrow, constitutional interpretation of the statute was consistent with the Legislature's intent. Gerald, supra, 113 N.J. at 91, 549 A.2d 792.
*89 Prior to enactment, Senator Russo stated that the statute was not intended to be as broad as capital legislation in other states, in that "[i]t does not cover as many people as some of the other [states'] legislation does." Capital Punishment Act: Hearings on S. 112 Before the Senate Judiciary Committee (1982) at 1. Senator Russo explained that the statute required separate guilt and penalty phases, and that the defendant only faces death penalty proceedings after having been "found guilty unanimously and beyond a reasonable doubt of first degree murder, wilfull, premeditated murder."[1]Id. (emphasis added). Senator Russo also stated, "[t]he bill deals with a conviction of first degree murder," id. at 2, and expressed his intent to draw the act as "tight" and "limited" as possible, id. at 30. The Senate Judiciary Committee Statement to S-112 (1982) provided that "only a person who actually commits an intentional murder * * * would stand in jeopardy of the death penalty." Similarly, the statement accompanying Assembly Bill No. 771, 1982 (identical to Senate Bill No. 112, which ultimately became the death penalty statute) stated: "Pursuant to the provisions of the bill, anyone who `purposely' or `knowingly' commits murder * * * would stand in jeopardy of the death penalty." The death penalty act also stiffened the punishment for non-capital murders by imposing a mandatory minimum thirty-year sentence without parole. N.J.S.A. 2C:11-3b.
Gerald noted that the legislative history was consistent with New Jersey's former death penalty statute, under which only those who committed intentional murder, felony murder, or murder of a law enforcement official were eligible for the death penalty. Gerald, supra, 113 N.J. at 90, 549 A.2d 792. Under the former statute, if the defendant only intended to cause serious bodily injury, the person was guilty of second-degree murder and was subject only to a prison term. State v. Ramseur, 106 N.J. 123, 388-89, 524 A.2d 188 (1987) (Handler, J., dissenting) (citing State v. Thomas, 76 N.J. 344, 387 A.2d 1187 (1978); State v. *90 Madden, 61 N.J. 377, 294 A.2d 609 (1972); State v. Anderson, 35 N.J. 472, 497, 173 A.2d 377 (1961); State v. Wynn, 21 N.J. 264, 121 A.2d 534 (1956)). Therefore, the legislative statements, made in connection with the 1982 enactment, indicating that the death penalty applies to "intentional murder" and first-degree murder no doubt referred to situations where the defendant intended to cause death.
Senator Russo's 1982 statements are consistent with remarks he made following Gerald in connection with proposed legislative action to overturn Gerald. At a July 10, 1989 public hearing concerning a proposed amendment to the Constitution to declare application of the death penalty to SBI murders not cruel and unusual punishment, Senator Russo made the following statements:
We said, if you intended to commit murder * * * you are now subject to execution * * *.
[W]e came to the conclusion, right or wrong  some feel it should have gone further, some, of course, feel it shouldn't have gone that far  that unless you intended to commit murder, you won't be subject to that greater penalty of death. That was a judgment made by this Governor, by myself as sponsor, and in its message by the majority of the Legislature in both parties, overwhelmingly.
[Public Hearing Before the Assembly Judiciary Committee on Assembly Concurrent Resolution No. 147, July 10, 1989, at 21.]
[T]he legislative history that's quoted in the court's opinion is what the Governor and I specifically and carefully in our comments publicly outlined that we intended the death penalty to apply to. * * *
[T]he Governor and his staff, and my staff and I intended only to apply the death penalty where one intended the result. It may be that there's an amendment necessary, to clarify our intent at the time, but not [the proposed amendment to the Constitution]. And that was in every public statement. * * *
But the thing I'm trying to emphasize is, that at no time did we intend  other than the actual perpetrator or that the perpetrator who actually does it, also must have intended death.
[Id. at 22.]
My opposition to this is consistent with the view I've had from the beginning; that the death penalty should only apply to one who intends to commit murder.
* * * * * * * *
The Committee Statement does say  we're referring to the Committee Statement to the Death Penalty Bill  that it only applies to those who intended murder.

*91 [Id. at 23-24.]
At a May 26, 1992 public hearing on the constitutional amendment, Senator Russo again stated:
In New Jersey, as you know, there is no such thing as recorded sessions and things of that sort, so legislative intent is generally difficult. So I am basically giving you my recollection, what my intent was as sponsor, and my discussions with the Governor, Governor Kean at the time. It was always  it was always  my intent as sponsor, and Governor Kean's, that the death penalty in New Jersey would be applied in only those unusually savage and severe murder cases where the defendant intended the death of his victim.
* * * * * * * *
That is what I understand Governor Kean had in mind, and that is what I understand that most of the legislature was voting on.
[Public Hearing Before Senate Judiciary Committee on Assembly Concurrent Resolution No. 20, May 26, 1992, at 8-9.]
Senator Bubba, who voted for the death penalty in 1982 and who favored applying the death penalty to SBI murders at that time, also agreed that the 1982 act only applied to intentional murders. Id. at 40. Although not dispositive, it is clear that legislative statements made subsequent to legislation shed light on legislative intent. State v. Bey, 112 N.J. 45, 97 & n. 32, 98, 548 A.2d 846 (1988).
We are mindful that the Supreme Court stated in Gerald that "[t]he death-penalty statute clearly exposes to the death penalty one who purposely or knowingly causes serious bodily injury resulting in death." Gerald, supra, 113 N.J. at 71, 549 A.2d 792. Certainly this statement was consistent with the plain language of the statute, which prior to amendment read:
a. * * * [C]riminal homicide constitutes murder when:
(1) The actor purposely causes death or serious bodily injury resulting in death; or
(2) The actor knowingly causes death or serious bodily injury resulting in death * * *.
* * * * * * * *
c. Any person convicted under subsection a.(1) or (2) who committed the homicidal act by his own conduct or who as an accomplice procured the commission of the offense by payment or promise of payment, of anything of pecuniary value shall be sentenced [in accordance with the Act's capital punishment provisions] * * *.
[N.J.S.A. 2C:11-3 (emphasis added).]
*92 "[H]omicidal act" was not defined. This apparent death penalty exposure, however, seems to have been inadvertent and not representative of the intent of the Legislature. It no doubt resulted from the adoption of the death penalty statute after the Code by engrafting the death penalty provisions onto the murder statute. See Gerald, supra, 113 N.J. at 89, 549 A.2d 792.
Following Gerald, the Supreme Court held in several capital cases involving vicious murders that it was possible that the jury could have found that the defendant only intended to inflict serious bodily injury.[2] Since these cases were tried prior to Gerald, no distinction was made between SBI and intentional murder, and therefore several death penalty sentences were set aside. The constitutional amendment was proposed to prevent defendants from avoiding the death penalty for heinous murders in cases where it is difficult to prove an intentional killing as opposed to intent to cause serious bodily injury that results in death. Public Hearing Before Senate Judiciary Committee on Assembly Concurrent Resolution No. 20, May 26, 1992, at 4-6, 37, 39, 42; Public Hearing Before Assembly Judiciary Committee on Assembly Concurrent Resolution No. 20, March 16, 1992, at Appendix 1-6.
The constitutional amendment was approved by the voters and took effect on December 3, 1992. Following passage of the amendment, the death penalty statute was amended effective May 5, 1993 to define "homicidal act" as: "conduct that causes death or serious bodily injury resulting in death." N.J.S.A. 2C:11-3i. The Statement of the Assembly Judiciary accompanying the May 5, 1993 amendment states:
Therefore, in order to clarify legislative intent and thereby avoid additional judicial construction that might narrow the scope of the law to comport with the *93 court's view of the legislative intent, this bill would amend New Jersey's death penalty statute to clearly state that the term "homicidal act" means conduct that causes "death or serious bodily injury resulting in death." This amendment clarifies that the Legislature's intent regarding the category of homicides eligible for the death penalty has remained consistent since the effective date of P.L. 1982, c. 111 which added subsection c. and other subsections to N.J.S. 2C:11-3, the current capital punishment statute.

[Statement of the Assembly Judiciary, Law & Public Safety Committee, No. 2113, L. 1993, c. 111 (emphasis added).]
A November 25, 1992 letter from Attorney General, Robert J. Del Tufo, in response to Governor Florio's request for advice with respect to the need for further legislation to implement the constitutional amendment, states that "[w]hile implementing legislation is not essential, clarification of the Legislature's intent in enacting the death penalty statute is advisable if we are to ensure that the constitutional decision of the people of this State is given full effect." The Attorney General noted that the court held in Gerald that its decision "comport[ed] with the Legislature's intent in restoring the death penalty." (Quoting Gerald, supra, 113 N.J. at 89, 549 A.2d 792.) Thus, the Attorney General suggested that it was "desirable for the Legislature to restate its intention to subject persons convicted of this form of murder to the death penalty. Such action would serve to retract any remaining invitation for judicial construction that could narrow the law to comport with the Court's view of the Legislature's intent."
After enactment of the amendment to the death penalty statute, the Governor's Office issued the following statement:
"Last November, the citizens of New Jersey spoke out on an issue that concerns us all. They wanted to be sure that vicious killers who cause a death face the possibility of death themselves, so they amended the state Constitution to make that intent crystal clear. We're here today to carry out their will," said Governor Florio. * * *
"This new law ensures that our statutes are consistent with the constitution and it reflects our belief as a society that there are crimes so heinous, so depraved, that people who commit them forfeit their own claims on life," said the Governor. * * *
The law clarifies the intent of the death penalty law in accordance with a constitutional amendment approved by the voters last November. Following its passage, Governor Florio directed Attorney General Robert Del Tufo to take *94 immediate steps to ensure the proper implementation of the amendment, which led to the legislation signed by the Governor. * * *
Under the current law, prosecutors can seek the death penalty only in cases where an intent to kill can be demonstrated.
[(Emphasis in the original.)]
Based on the legislative history and the statements accompanying the bills, we are persuaded that the death penalty statute enacted in 1982 was intended to apply only to intentional murders. Contrary to the dissent's assertion that the legislative history is ambiguous and unenlightening, we have not been presented with a single piece of legislative history that indicates otherwise. Therefore, it is only following the legislative amendment in May 1993 that SBI murders clearly became capital crimes.
We do not question the logic or authority for the dissenter's position. He makes a strong technical argument for his view. However, in the context of the imposition of the death penalty, we would find it abhorrent to disregard the available evidence of the Legislature's intent merely to preserve strict legal principles of construction. See State v. Bey, supra, 112 N.J. at 100, 548 A.2d 846 (rejecting State's argument that legislative intent is unimportant "so long as its `choice of language' brings the instant facts within the reach of the statute").
The State nonetheless argues that adoption of the constitutional amendment declaring imposition of the death penalty not cruel and unusual punishment as applied to SBI murders immediately validated the death penalty statute and exposed SBI murderers to the death penalty from that time forward without the need for further legislation to implement the change. We reject this view.
A constitutional amendment was necessary after the Gerald decision if any legislative amendment to the death penalty statute to include SBI murders was to withstand constitutional attack. Once the constitutional amendment removed the constitutional prohibition, further legislation was required to make the death penalty statute applicable to SBI murder because the death penalty statute, as it stood upon enactment in 1982, did not apply to SBI murders. Therefore, the change did not become effective *95 until May 5, 1993 when the legislative amendment was signed into law.
Penal statutes and their penalties must be strictly construed. In re Suspension of DeMarco, 83 N.J. 25, 36, 414 A.2d 1339 (1980); State v. Valentin, 105 N.J. 14, 17-18, 519 A.2d 322 (1987). "Where more than one reasonable interpretation may be made, construction should be drawn against the State." DeMarco, supra, 83 N.J. at 40, 414 A.2d 1339 (citations omitted) (Schreiber, J., dissenting). Accord State v. Biegenwald, 96 N.J. 630, 640, 477 A.2d 318 (1984); Valentin, supra, 105 N.J. at 18, 519 A.2d 322.
The question ultimately is one of fairness, given the statute and its provisions, and given the situation of the defendant. Should he have understood that his conduct was proscribed, should he have understood that the penalty about to be imposed was the sanction intended by the legislature?
[DeMarco, supra, 83 N.J. at 37, 414 A.2d 1339.]
The strict construction rule also guards against imposition, by judicial construction, of punishment not intended by the legislature. See Sutherland Statutory Construction, § 59.03, at 105 (1992); DeMarco, supra, 83 N.J. at 37, 414 A.2d 1339.
In re DeFalco, 9 N.J. 236, 87 A.2d 707 (1952), is the only New Jersey case that squarely addresses the issue of validation of unconstitutional statutes by constitutional amendment. The Constitution originally provided that the penalty for bookmaking was a fine and imprisonment and that the legislature was not empowered to diminish the penalty. A subsequent statute provided that the penalty for bookmaking was a fine or imprisonment. Subsequent to enactment of the statute, the Constitution of 1947 was adopted containing no limitation on the Legislature's power to diminish penalties. Subsequently, defendant was convicted of bookmaking and sentenced to a fine and a prison term. Defendant challenged his sentence on the ground that the sentence was contrary to the current statute, which provided for imposition of a fine or imprisonment. The Court held that the statute was invalid when enacted because it diminished the penalty for bookmaking in violation of the constitution then in effect. The court held that the adoption of the new constitution, which granted the Legislature *96 authority to diminish the penalty, did not validate the previously unconstitutional statute. Id. at 240, 87 A.2d 707. The Court held:
A statute which is unconstitutional at the time of enactment does not acquire a valid status simply by reason of a subsequent amendment to the basic charter or by the adoption of a new one. In Washington Nat'l Insur. Co. v. Board of Review, 1 N.J. 545 [64 A.2d 443] (1949), we said: "the constitutional validity of legislation in this regard is to be measured by the organic law in force when the legislation was adopted, except to the extent that the later constitution is made retroactive."
[Id. (emphasis added).]
The Court noted: "There is nothing in the provisions of the 1947 Constitution to give it the retroactive force here contended for." Id. Likewise, in the present case, there is nothing in the constitutional amendment as adopted by the voters which dictates that it served to validate the death penalty for SBI murder without the need for legislative action.
In State v. John Dow, No. 93-07-1182 (Law Div. August 18, 1994), the judge addressed the same question presented in this case. He determined that SBI murderers became eligible for the death penalty on May 5, 1993, the date of the enactment of the legislative amendment to the death penalty statute. The judge noted that generally constitutional amendments act prospectively and that generally a constitutional amendment will not act to validate previously invalid statutes. Id. at 18. With regard to whether the amendment was self-executing, the judge held:
In the present case, it is apparent from the limitation imposed by Gerald and addressed by the constitutional amendment that the amendment indicates a line of policy to be followed; however, it does not set out any means by which to implement this principle. The amendment only provides guidance as to what the Constitution will allow in the way of future laws. The Legislature is empowered to execute this policy through legislative directives.
[Id. at 20-21.]
Most courts recognize that in limited circumstances a constitutional amendment may validate previously unconstitutional legislation. The key factor is the existence of a clear intent to validate the existing legislation. For example in Bonds v. State Dept. of Revenue, 254 Ala. 553, 49 So.2d 280 (1950), the court held that a *97 constitutional amendment proposed in 1949 and adopted to validate an earlier 1949 statute that was clearly unconstitutional at the time of enactment, could "by the use of express and clear terms validate and confirm an act of the legislature previously enacted but invalid on account of failure to observe provisions of the State Constitution." Bonds, supra, 49 So.2d at 282. Similarly, in Porto Rico Brokerage Co. v. United States, 71 F.2d 469 (C.C.P.A. 1934), cert. denied, 298 U.S. 671, 56 S.Ct. 936, 80 L.Ed. 1394 (1936), the court suggested that a previously unconstitutional statute may be validated by constitutional amendment, without subsequent legislation, if the amendment clearly reveals an intent to validate the earlier legislation. Id. at 470-72. Accord State ex rel. Miller v. Board of Education, 212 Kan. 482, 511 P.2d 705, 710 (1973) (intention has important bearing in determining whether a constitutional provision is self-executing); State ex rel. Nixon v. Belt, 873 S.W.2d 644, 647 (Mo. App.Ct.), overruled on other grounds, 887 S.W.2d 397 (Mo. 1994) (constitutional provisions self-executing where there is manifest intention that they go into immediate effect); 16 Am.Jur.2d Constitutional Law § 65, at 383-84 (1979); cf. People ex rel. McClelland v. Roberts, 148 N.Y. 360, 42 N.E. 1082 (Ct.App. 1896); Kayden Indus., Inc. v. Murphy, 34 Wis.2d 718, 150 N.W.2d 447 (1967).
Constitutional amendments can validate previously unconstitutional statutes if there is a clear intent to do so. Inasmuch as the purpose of the 1992 constitutional amendment was to overturn Gerald, and to make SBI murder a capital offense, we believe that if the original death penalty statute clearly exposed SBI homicides to the death penalty, the constitutional amendment would have served to validate the statute and to make it effective at the date the amendment was approved by the voters. That, however, is not the situation here. At the time the constitutional amendment was adopted, the statute did not clearly expose SBI murders to the death penalty. The Senate Judiciary Committee Statement accompanying the 1982 death penalty statute and other legislative *98 history makes this clear.[3] Absent contrary evidence, the court must assume that the Legislature adopted the intent of the Judiciary Committee. See Sutherland, supra, § 48.06, at 332-33.
Following Gerald, the constitutional amendment was necessary to allow the statute to be extended to SBI homicides. Once the constitutional amendment was approved, it was necessary for the Legislature to implement the change. The Legislature could not alter the original intent of the statute by merely proposing the constitutional amendment; the original intent remained until the statute was amended by the Legislature. Protection Mutual Insur. Co. v. Kansas City, 504 S.W.2d 127 (Mo. 1974) (absent legislative act amending statute, original intent governs); Axe Science Corp. v. Commonwealth, 6 Pa.Cmwlth. 103, 293 A.2d 617, 620 (1972) (original legislative intent stands until further legislative action); see Sutherland, supra, § 48.10, at 343. The purpose of placing the amendment before the voters was to remove the constitutional impediment, it did not in itself amount to legislative action amending the existing statute.
The order under review is affirmed. The matter is remanded for further proceedings.
SKILLMAN, J.A.D., dissenting.
I read State v. Gerald, 113 N.J. 40, 69-91, 549 A.2d 792 (1988) to hold that the New Jersey death-penalty statute enacted in 1982, L. 1982, c. 111, § 1, N.J.S.A. 2C:11-3(c), is applicable to any murder committed by a defendant's "own conduct" or by the "payment or promise of payment of anything of pecuniary value," regardless of whether the defendant purposely or knowingly caused "death" or "serious bodily injury resulting in death." Therefore, I dissent from the majority's conclusion that the State lacks the authority to *99 seek the imposition of the death penalty upon a murderer who purposely or knowingly caused serious bodily injury resulting in death (referred to hereinafter as SBI murder) subsequent to the effective date of the constitutional amendment eliminating the constitutional impediment to the death penalty for SBI murder but prior to enactment of L. 1993, c. 111, § 1, N.J.S.A. 2C:11-3(i), reaffirming the statutory authorization for this punishment.
In Gerald the Supreme Court stated in clear and unequivocal terms that its conclusion that the death penalty could not be imposed for SBI murder was based upon the New Jersey Constitution: "We hold, on state constitutional grounds, that a defendant who is convicted of purposely or knowingly causing `serious bodily injury resulting in death' under N.J.S.A. 2C:11-3(a)(1) and (2), or either of them  as opposed to one who is convicted of purposely or knowingly causing death under those same provisions  may not be subjected to the death penalty." 113 N.J. at 69, 549 A.2d 792. The Court then devoted the next twenty-one pages of its opinion to a discussion of the unconstitutionality of N.J.S.A. 2C:11-3(c) as applied to SBI murder. Id. at 71-91, 549 A.2d 792. If the Court in Gerald had concluded that N.J.S.A. 2C:11-3(c) does not apply to SBI murder, as the majority of this panel has now concluded, the Court would have had no need even to consider the constitutionality of the death penalty for SBI murder. In fact, if the Court in Gerald had ruled upon the constitutionality of imposition of the death penalty for SBI murder even though the Legislature had not authorized this punishment, its decision would have been inconsistent with the firmly established principle that "a court should not reach and determine a constitutional issue unless absolutely imperative in the disposition of the litigation." Donadio v. Cunningham, 58 N.J. 309, 325-26, 277 A.2d 375 (1971). Therefore, Gerald should not be read to hold that the imposition of the death penalty for SBI murder is unconstitutional but the Legislature did not intend to authorize the death penalty for such murders in any event, unless the Court clearly and unequivocally expressed such a conclusion.
*100 However, to the contrary, the Court stated several times during the course of its opinion in Gerald that N.J.S.A. 2C:11-3(c) is applicable to SBI murder. The Court commenced its discussion of the constitutional issue by broadly stating: "The death-penalty statute clearly exposes to the death penalty one who purposely or knowingly causes serious bodily injury resulting in death." 113 N.J. at 71, 549 A.2d 792. The Court then referred to Justice Handler's dissent in State v. Ramseur, 106 N.J. 123, 388, 524 A.2d 188 (1987), where he had stated with equal clarity that "the current Act `includes, as capital murder, death that results solely from the intentional infliction of serious bodily harm.'" 113 N.J. at 72, 549 A.2d 792. The Court reiterated this conclusion later in its opinion:
As the statute is written, all defendants convicted of purposeful or knowing murder under N.J.S.A. 2C:11-3(a)(1) and (2) are exposed to the death penalty under N.J.S.A. 2C:11-3(c), provided that they either committed the homicidal act by their own conduct or hired another to commit that act. All such defendants, including those who did not intend the death of their victim, face the death penalty as a potential punishment.
[Id. at 85, 549 A.2d 792.]
The Court concluded that the statute, as thus written, "creates gross disproportionality in light of the penalties imposed on conviction for crimes such as aggravated assault, N.J.S.A. 2C:12-1(b)(1), aggravated manslaughter, N.J.S.A. 2C:11-4(a), and felony-murder, N.J.S.A. 2C:11-3(a)(3). As such, the infliction of capital punishment on one who does not intend his or her victim's death is a violation of our state constitutional prohibition against cruel and unusual punishment." Id. at 85, 549 A.2d 792. After a lengthy discussion of this disproportionality, id. at 85-89, 549 A.2d 792, the Court concluded:
We therefore conclude that imposition of the death penalty on one who is convicted under N.J.S.A. 2C:11-3(a)(1) and (2), or either of them, of the purposeful or knowing infliction of serious bodily injury resulting in death is not permissible under Article I, paragraph 12 of our state constitution.
[113 N.J. at 89, 549 A.2d 792.]
In short, the Court in Gerald held that N.J.S.A. 2C:11-3(c) subjects a person who commits SBI murder to the death penalty *101 but that the death penalty is unconstitutional as applied to this category of murder.
The majority relies upon a three paragraph discussion of legislative history in Gerald to support its conclusion that the 1982 death-penalty statute does not apply to SBI murder. This discussion, which immediately follows the Court's constitutional holding quoted in the preceding paragraph, begins with a sentence which states: "The foregoing result comports with the Legislature's intent in restoring the death penalty." 113 N.J. at 89, 549 A.2d 792. Considered in isolation from the rest of the opinion, this single sentence could be read to state, as an alternative to the Court's previously expressed holding that the imposition of the death penalty for an SBI murder is unconstitutional, that the Legislature did not intend to authorize the death penalty for this category of murder. However, the Court's subsequent discussion places this sentence in a different perspective. The Court did not say in the following three paragraphs that the legislative history of the 1982 death-penalty statute negated its previously expressed holding, drawn from the plain language of N.J.S.A. 2C:11-3(a) and N.J.S.A. 2C:11-3(c), that "[t]he death-penalty statute clearly exposes to the death penalty one who purposely or knowingly causes serious bodily injury resulting in death." 113 N.J. at 71, 549 A.2d 792. Instead, the Court concluded only that this legislative history is "instructive" and that it is "important in analyzing the current statute." Id. at 90, 549 A.2d 792.
In the immediately following discussion, the sense in which the legislative history is "important in analyzing the current statute" becomes evident. Id. at 91, 549 A.2d 792. This part of the opinion begins with the Court reiterating its previously expressed conclusion that the 1982 death-penalty statute is unconstitutional as applied to SBI murder  not that the Legislature did not intend the statute to apply to such murders:

Having concluded that the Act is unconstitutional to the extent that it exposes to the death penalty some defendants who kill without intending to do so, we turn to the question of what result should follow from that conclusion.
[Ibid. (emphasis added).]
*102 The Court then notes its obligation to preserve the constitutionality of a legislative enactment if that can be done consistent with legislative intent:
As we have stated, "[i]t is our duty to save a statute if it is reasonably susceptible to a constitutional interpretation." ... Our inquiry focuses on whether the legislature would prefer that the statute survive with an appropriate constitutional construction, or whether it would prefer that the statute "succumb to constitutional infirmities."
[Ibid. (quoting Right to Choose v. Byrne, 91 N.J. 287, 311, 450 A.2d 925 (1982)).]
After stating these basic principles governing constitutional challenges to legislative enactments, the Court concluded:
We have no doubt that the legislature would prefer that the Act be subjected to a narrowing construction that would free it from constitutional defect, a construction that comports with the legislature's stated intent in originally adopting the Act.

[Ibid. (citations omitted; emphasis added).]
The italicized portion of this sentence indicates that the Court's purpose in reviewing the legislative history of the 1982 death-penalty statute was not to demonstrate that the Legislature intended to exempt SBI murders from the death penalty but rather to answer the question "whether the legislature would prefer that the statute survive with an appropriate constitutional construction, or whether it would prefer that the statute succumb to constitutional infirmities." Ibid. Having decided with the aid of legislative history that "the legislature would prefer that the statute survive with an appropriate constitutional construction," the Court concluded that "it is incumbent on us to `engage in "judicial surgery" to excise [the] constitutional defect.'" Ibid. (quoting Right to Choose v. Byrne, supra, 91 N.J. at 311, 450 A.2d 925). It obviously would have been unnecessary for the Court to undertake "judicial surgery" to save the constitutionality of the death-penalty statute if the statute as written did not apply to SBI murders.
Therefore, notwithstanding the "judicial surgery" that the Court performed on the 1982 death-penalty statute to preserve its constitutionality, the statute remained in effect subject to implementation in its original form in the event the New Jersey Constitution were amended to remove the constitutional impediment *103 to the statute's application to SBI murder. A "statute declared unconstitutional is void in the sense that it is inoperative or unenforceable, but not void in the sense that it is repealed or abolished; ... so long as the decision stands the statute is dormant but not dead." Jawish v. Morlet, 86 A.2d 96, 97 (D.C. 1952). Therefore, the Legislature is not required to reenact a statute if the impediment to its full implementation imposed by a declaration of unconstitutionality is eliminated by a subsequent constitutional amendment. Furthermore, the primary theoretical objection raised by some scholarly commentators to the revival of a statute when a judicial decision declaring the statute unconstitutional is subsequently overruled  that a judicial declaration of invalidity may have aborted efforts to repeal a statute and that the revived statute may not reflect the current will of the people as it would now be expressed through the legislative process, see William M. Treanor & Gene B. Sperling, Prospective Overruling and the Revival of "Unconstitutional" Statutes, 93 Col.L.Rev. 1902 (1993),  has no applicability when a judicial decision declaring a statute unconstitutional has been overruled by a direct expression of the people's will through the passage of a constitutional amendment.
A declaration that a validly enacted statute is unconstitutional in certain of its applications must be distinguished from a declaration that the Legislature lacks the constitutional authority to enact a particular kind of legislation. As one commentary has noted, "the legislature cannot pass a statute that exceeds its powers; if the meaning of the Constitution changes so that the powers of the legislature expand, legislation once beyond the legislature's scope but now permissible must be repassed to be enforceable." Treanor and Sperling, supra, 93 Col.L.Rev. at 1934. Thus, in In re DeFalco, 9 N.J. 236, 87 A.2d 707 (1952), cited by the majority, the Court held that an amendment to a statute authorizing the imposition of either imprisonment or a fine for bookmaking, where previously both imprisonment and a fine were required, violated a provision of our former State Constitution which prohibited the Legislature from enacting legislation that "diminished" the punishment *104 "now provided" for gambling offenses. The Court concluded that since this statute was beyond the Legislature's lawmaking authority at the time of its enactment, it could not be validated by subsequent constitutional amendment repealing this limitation upon legislative authority. Id. at 240, 87 A.2d 707. In contrast, the Legislature unquestionably had the constitutional authority to adopt a death-penalty statute in 1982, and the Court's declaration in Gerald that some applications of the statute were unconstitutional did not invalidate the statute. Therefore, the Legislature was not required to reenact legislation authorizing imposition of the death-penalty for SBI murder when the electorate passed a constitutional amendment removing the constitutional impediment to full implementation of the 1982 death-penalty statute.
Despite the Supreme Court's holding in Gerald that "[t]he death-penalty statute clearly exposes to the death penalty one who purposely or knowingly causes serious bodily injury resulting in death," 113 N.J. at 71, 549 A.2d 792, the majority reexamines the legislative history of the 1982 death penalty statute and reaches the opposite conclusion. I would decide this appeal solely on the basis of Gerald without revisiting any legislative history. In any event, I consider the legislative history relied upon by the majority to be ambiguous and unenlightening.
The majority relies heavily upon statements made by former Senator Russo while speaking in opposition to proposed amendments to the New Jersey Constitution designed to eliminate the constitutional impediment to imposition of the death penalty for SBI murder. Public Hearing before Assembly Judiciary Committee on Assembly Concurrent Resolution No. 147, July 10, 1989, at 21-24; Public Hearing before Senate Judiciary Committee on Assembly Current Resolution No. 20, May 26, 1992, at 8-9. However, the statements of individual legislators are not generally considered to be a reliable guide to legislative intent. See West Va. Univ. Hosps., Inc. v. Casey, 499 U.S. 83, 98-99, 111 S.Ct. 1138, 1147, 113 L.Ed.2d 68, 83 (1991). When such statements are *105 presented subsequent to enactment of a statute by an opponent of a new legislative initiative, they constitute a particularly unreliable indicator of the prior Legislature's intent. See Blanchette v. Connecticut Gen. Ins. Corps., 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320, 347 (1974). Senator Russo's 1982 statement regarding the intended reach of the death penalty statute is also not enlightening, because it is cast in the terminology of the former Title 2A, which was repealed in 1978, L. 1978, c. 95, N.J.S.A. 2C:98-2, rather than the Code of Criminal Justice which the 1982 death-penalty statute amended.
The only other legislative history of the 1982 death penalty statute cited by the majority is the Senate Judiciary Committee Statement and the Sponsor's Statement to the Assembly Bill. Although such statements are better guides to legislative intent than the views of individual legislators, see Garcia v. United States, 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472, 478 (1984), the particular statements upon which the majority relies are not especially informative. The Senate Statement indicates that the death penalty may only be imposed upon a person "who actually commits an intentional murder." Senate Judiciary Committee Statement to S-112 (1982). However, the term "intentional murder" is not used anywhere in the Code of Criminal Justice, and is not self-defining. Indeed, since N.J.S.A. 2C:11-3(a)(1) and (2) do not distinguish between a person who purposely or knowingly "causes death" and a person who purposely or knowingly "causes serious bodily injury resulting in death," the term "intentional murder" could be construed to refer to any murder committed in violation of N.J.S.A. 2C:11-3(a)(1) or (2). Compare State v. Harvey, 121 N.J. 407, 412, 581 A.2d 483 (1990), cert. denied, 499 U.S. 931, 111 S.Ct. 1336, 113 L.Ed.2d 268 (1991), which refers to "knowingly or purposely causing death" as "intentional murder," with Justice Handler's concurring and dissenting opinion in State v. McDougald, 120 N.J. 523, 590, 577 A.2d 419 (1990), which refers to "intent-to-kill murder" and "intent to inflict serious bodily injury murder" as "the two forms of intentional murder." Most significantly, the Sponsor's Statement accompanying the Assembly *106 Bill, that "[p]ursuant to the provisions of the bill, anyone who `purposely' or `knowingly' commits murder would stand in jeopardy of the `death penalty'," directly supports the conclusion that any person who commits a murder prohibited by N.J.S.A. 2C:11-3(a)(1) or (2) and who satisfies the death penalty eligibility criteria set forth in N.J.S.A. 2C:11-3(c) is subject to the death penalty.
Although legislative history may be relied upon as an aid in construing an ambiguous statute, State v. Szemple, 135 N.J. 406, 422, 640 A.2d 817 (1994), the majority has turned this principle on its head by taking a statute whose meaning is clear on its face and using ambiguous legislative history to reach a result which is contrary to the plain meaning of the statute. Legislative history should be used only "to solve doubt, and not to create it." New Jersey Civil Serv. Ass'n v. State of N.J., 88 N.J. 605, 615, 443 A.2d 1070 (1982) (quoting Railroad Comm'n of Wisc. v. Chicago Burlington R.R. Co., 257 U.S. 563, 589, 42 S.Ct. 232, 237, 66 L.Ed. 371, 383 (1921)).
Therefore, I would reverse.
NOTES
[1] At the time of Senator Russo's comments, the Code had done away with the former first and second degree murder classifications.
[2] See State v. Coyle, 119 N.J. 194, 208-12, 574 A.2d 951 (1990); State v. Davis, 116 N.J. 341, 374-75, 561 A.2d 1082 (1989); State v. Jackson, 118 N.J. 484, 572 A.2d 607 (1990); State v. Pennington, 119 N.J. 547, 560-65, 575 A.2d 816 (1990); State v. Long, 119 N.J. 439, 460-64, 575 A.2d 435 (1990); State v. Harvey, 121 N.J. 407, 414, 581 A.2d 483 (1990).
[3] "[A]bsent contrary legislative history, a clear statement in the principal committee report is powerful evidence of legislative purpose and may be given effect even if it is imperfectly expressed in statutory language." Sutherland, supra, § 48.06, at 332 (citing Miller v. Federal Mine Safety and Health Review Comm'n, 687 F.2d 194 (7th Cir.1982)).